**Bettye Joe BAKER et al., Plaintiffs-Appellees,**

**v.**

**COLUMBUS MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants-Appellants.**

**No. 71-2531.**

United States Court of Appeals, Fifth Circuit.

June 30, 1972.

Shield Sims, C. Darrell Reeves, Sims & Sims, Columbus, Miss., for defendants-appellants.

Stephen J. Pollak, Richard M. Sharp, Washington, D. C., T. H. Freeland, Oxford, Miss., David Rubin, National Education Assn. of the U. S., Ralph J. Moore, Jr., Freeland & Gafford, Oxford, Miss., for plaintiffs-appellees; Shea & Gardner, Washington, D. C., of counsel.

Before RIVES, COLEMAN and DYER, Circuit Judges.

DYER, Circuit Judge:

In January, 1970, Columbus Municipal Separate School District initiated a policy that required teachers hired for the first time during the 1969–1970 school year, and all future teacher applicants, to achieve a combined score of 1000 on the National Teachers Examination (NTE) as a condition of employment. The score requirement excluded proportionally more incumbent black than white teachers. Of the 133 black teachers, 18 were required to take the test. Only one achieved the minimum score of 1000. Of the 243 white teachers, 73 were required to take the test and 64 either met or surpassed the minimum score requirement. The district court held that the use of the NTE was unlawful under the equal protection clause of the Fourteenth Amendment because it created a racial classification, and it was not shown to have a manifest relation to job performance. The court also found that Columbus had purposely discrimi-

nated against blacks by the use of the NTE score requirement.[1]

The purposeful discrimination finding of the district court was based upon three factors in addition to the racially disproportionate effect produced by the NTE score requirement. First, Columbus knew that the use of the NTE would produce racially disproportionate results because the test had been used in the three preceding years as an element of a merit pay program.[2] During the first year of its use in that program 20 percent of the black teachers who took the test achieved the minimum score while 96 percent of the white teachers tested met the minimum score. In the second and third years of its use 14 percent and 53 percent respectively of the black teachers tested and 87 percent and 95 percent respectively of the white teachers tested achieved a minimum score.

Another indicia of discrimination was found by the court when Columbus required two black teachers hired during the spring term of the 1968–1969 school year to take the test while other teachers employed during that year did not have to take the test. Finally, Columbus hired only one black out of 44 new teachers hired when 9 NTE qualified blacks had applied.

██ In matters concerning faculty standards and other internal administrative and professional procedures we prefer, if possible, to defer to the judgment of the school administrators. However, the percentage of blacks who failed to meet the 1000 cut-off score compared to the percentage of whites who failed is a circumstance that cannot be dealt with lightly.[3] Whenever the effect of a law

or policy produces such a racial distortion it is subject to strict scrutiny. See Korematsu v. United States, 1944, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194. Even though this policy does not on its face purport to classify along racial lines as in Korematsu and in McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222, its effects can be just as devastating. See Hawkins v. Shaw, 5 Cir. 1972, 461 F.2d 1171, 1172 (en banc). In order to withstand an equal protection attack it must be justified by an overriding purpose independent of its racial effects.

██ A school district's desire to improve its faculty may be such an overriding purpose, provided the policies and procedures employed to implement this goal are clearly related to it. See Armstead v. Starkville Municipal Separate School District, 5 Cir. 1972, 461 F.2d 276; Chance v. Board of Examiners, 2d Cir. 1972, 458 F.2d 1167. But this is not such a case.

██ It is uncontradicted that the NTE cut-off score requirement was set by appellants without any investigation or study of the validity and reliability of the examination or the cut-off score as a means of selecting teachers for hiring or re-employment, and without consultation with the Educational Testing Service. The superintendent disavowed any expertise in the matter, albeit he was aware of the disparate results that would ensue. It was established that the NTE measures only a fraction of the characteristics required for effective classroom performance. It does not measure manual skills, teaching aptitude, attitudes, personal characteristics or

1. 329 F.Supp. 706.

2. Under the merit pay program points were awarded for a score of at least 500 on either the Common examinations portion of the NTE or upon one of the Teaching Area examinations.

3. In addition to the racial discrepancies evidenced by the use of the NTE in the merit pay program, an Educational Testing Service survey showed that the national average of students taking the

NTE Commons examinations from predominantly white institutions is 600 while those students taking the test from predominantly black institutions average 460. The average scores for Mississippi students are lower in both categories. The averages from predominantly white institutions varied from 507–622 while the averages from the predominantly black institutions ranged from 392–438.

classroom teaching performance. In short, the evidence supports the finding below that the appellants' purpose in using the NTE was not in fact independent of invidious racial discrimination, but was, on the contrary, used for the purpose of discrimination.

The district court found, and the record amply supports the finding, that Columbus acted with the purpose of barring proportionately more black teachers than white teachers from employment and re-employment. We cannot overlook the long history of racial discrimination coupled with the disproportionate reduction of black teachers when desegregation was ordered, the school district's knowledge from prior actual experience that the NTE cut-off score would eliminate relatively more black than white in service teachers and new applicants, and the uneven manner in which appellants applied the NTE cut-off score which eliminated two black teachers who were not subject to the requirement. Finally, stark evidence of a discriminatory hiring policy was shown by the hiring of 43 new white teachers and only 1 black teacher while 9 other black applicants with satisfactory NTE scores were rejected although there were 36 vacancies the day before school was open.

■ Columbus also appeals that portion of the district court's judgment that requires it to hire as many black teachers for the 1972–1973 school year as may be necessary to attain the racial ratio that existed during the 1969–1970 school year. It maintains that because the judgment does not refer to qualification, it requires Columbus to hire on the basis of race, not qualification, in violation of Carter v. West Feliciana Parish School Board, 5 Cir. 1970, 432 F.2d 875. We disagree. Of course any new teacher, black or white, must be qualified. The district court has properly required Columbus to turn back the faculty clock to the time when the NTE scores did not disqualify teachers for re-employment. *See* Smith v. Concordia Parish School Board, 5 Cir. 1971, 445 F.2d 285.

■ Finally, we attach a caveat to what has been said. We look with disfavor upon a test or policy which obviously disadvantages the black teachers, especially when this is due to the past inferior educational opportunities suffered by them. On the other hand, we fully recognize that a school district has the responsibility of providing the best possible education for its pupils, including efforts to constantly improve its faculty. When a test has a valid function in such a process and is fairly applied to all teachers, it outweighs the fact that it may result in excluding proportionally more blacks than whites.[4]

The judgment of the district court is Affirmed.

---

4. For examples of objective, non-racial and reasonable criteria see the appendices to United States v. Texas Education Agency, 5 Cir. 1972, 459 F.2d 600.