Eugene W. TYLER, Plaintiff-Appellant,

v.

Trammell E. VICKERY et al.,
Defendants-Appellees.

Ralph BANKS, Jr., Plaintiff-Appellant,

v.

Trammell E. VICKERY et al.,
Defendants-Appellees.

James E. C. PERRY et al.,
Plaintiffs-Appellants,

v.

Edward S. SELL, Jr., et al.,
Defendants-Appellees.

No. 74–3413.

United States Court of Appeals,
Fifth Circuit.

Aug. 20, 1975.

Rehearing and Rehearing En Banc
Denied Sept. 26, 1975.

---

Neil Bradley, Laughlin McDonald, Atlanta, Ga., Elaine R. Jones, Jeffry Mintz, Melvin L. Wulf, New York City, C. B. King, Albany, Ga., Ray P. McClain, Charleston, S. C., for plaintiffs-appellants.

Arthur K. Bolton, Atty. Gen., Dorothy Y. Kirkley, Asst. Atty. Gen., Atlanta, Ga., for defendants-appellees.

Before GEWIN, DYER and ADAMS,* Circuit Judges.

DYER, Circuit Judge:

This appeal presents a broad-based challenge to the constitutionality of the Georgia bar examination on due process and equal protection grounds. This suit before us, which has been certified by the district court as a class action on behalf of all black persons who have taken and failed the Georgia bar examination and have not been admitted to the practice of law in Georgia, as well as all black persons who will take the exami-nation in the future, results from the consolidation of several suits brought by black individuals who have been unsuccessful on the examination.

Summarized briefly, the Georgia bar examination is a two-day test administered biannually by the Georgia State Board of Bar Examiners (the Board), a group of five practicing lawyers appointed by the Georgia Supreme Court. Since February, 1972, the examination has been composed one-half of essay questions prepared and graded by the bar examiners, and one-half of the multiple choice Multistate Bar Examination (MBE), prepared and graded by the National Conference of Bar Examiners (NCBE), and administered simultaneously to bar examinees in a majority of states. Following grading, the scores on the essay and MBE portions of the examination are combined into a final grade according to one of three formulas recommended by the NCBE and selected by the Board. It has also been the practice of the Board, prior to final certification of the examination results, to convene and regrade failing papers which meet certain criteria such as falling close to the minimum passing score of 70, receiving a passing grade from a certain minimum number of examiners, or being recommended for regrading by an examiner. As a result of this reconsideration, a previously failing grade is on occasion raised to a passing score. No other review of a grade is provided.

The central focus of this litigation clearly is that black applicants as a class have traditionally experienced particular difficulty in passing the Georgia bar examination. This unfortunate situation reached a nadir in July, 1972, when each of the 40 black applicants taking the examination failed. On the February and July, 1973, examinations, slightly more than one-half the black applicants were unsuccessful, as compared to a failure rate of roughly one-fourth to one-third among white examinees.

Appellants' challenges to the constitutionality of the bar examination fall into

* Of the Third Circuit, sitting by designation.

three major areas. They claim: 1) that the examiners have used the bar examination to purposefully discriminate against black applicants on the basis of race; 2) that the bar examination inherently violates the fourteenth amendment's equal protection clause because of the highly disparate passing rates of black and white applicants; and 3) that the examination violates due process because there is no procedure for review of a failing grade.

Following extensive discovery by both sides which lasted several months, the district court granted summary judgment to appellees on each of these claims. After careful consideration of the record, we conclude that that court was correct in holding that there were no genuine issues of material fact to be resolved and that appellees were entitled to judgment as a matter of law. We therefore affirm its judgment.

## I. INTENTIONAL DISCRIMINATION

 Appellants' first major contention is that the bar examiners utilize the examination as a device to purposefully discriminate against prospective black attorneys on the basis of race. The district court found this allegation to be "totally without factual foundation," and hence appropriate for summary disposition. We agree that it presents no genuine issue of material fact which would require a trial.

 In so holding, we are mindful of the Supreme Court's admonition that "summary procedures should be used sparingly . . . where motive and intent play leading roles." Poller v. Columbia Broadcasting System, 1962, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d

458. However, discriminatory motivation, even if proved, is not in itself a constitutional violation, Palmer v. Thompson, 1971, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438, and becomes so only when given the opportunity to manifest itself in discriminatory conduct. Accordingly, appellees undertook to negate the materiality of intent as an issue of fact in this case not merely by denying racial animus but also by affirmatively demonstrating their inability to discover an applicant's race before grading had been completed.

The bulk of the evidence on this point was introduced through the deposition of Estes, an employee of the Georgia Supreme Court serving as Administrative Assistant to the Board, and the official primarily responsible for implementing the procedures designed to insure anonymity in the grading process. The substance of Estes' testimony was that while applicants are seated alphabetically and identified by name cards in the examination room, examination papers are identified and graded by number only. These numbers are drawn at random on individual cards by the applicants, who write their names on the cards and place them in sealed envelopes. These envelopes are then collected, sealed in a container in the examination room, and kept in the container in his custody throughout the grading process.[1] This testimony, which was uncontradicted,[2] was sufficient to show the absence of any genuine issue of material fact as to the examiners' direct access to information concerning an examinee's race during grading. *Fed.R.Civ.P.* 56(c).

Despite the examiners' inability to directly discover an applicant's race, appellants contend that a fact issue regarding

1. It was Estes' practice to open the container and begin matching names and numbers while the examiners were engaged in regrading. This matching was limited solely to numbers which the examiners had previously certified as having passed the examination; none of those not certified as passing were matched, whether the examination paper was being regraded or not. Moreover, the examiners were not notified of the status of any examinee until a decision had been reached on all papers.

2. Appellants attempted to counter this testimony with, for example, evidence that the "A" envelopes in which names and numbers were sealed were not completely opaque. But this evidence in no way speaks to the fact that the "A" envelopes were placed in another sealed container in the examination room. Thus, any person wishing to look into these envelopes for discriminatory purposes would have to examine them individually in the examination room, in full view of Board officials, exam monitors, and the examinees.

intentional racial discrimination is inferentially raised by the deposition of Dr. J. L. Dillard, linguist and author of *Black English: Its History and Usage in the United States* (1972). According to Dr. Dillard, many black persons tend to speak an English variant, characterized by structures such as the pre-verbal use of "been", which has been coined Black English. While all formal education, and in particular that at predominantly black institutions, attempts to inculcate Standard English usage rather than Black English, Dr. Dillard opined that a person who had spoken this dialect during his youth might revert to it under situations of extreme time pressure, such as during a bar examination. From this testimony appellants wish us to draw the twin factual inferences that black applicants utilized a 1) unique and 2) recognizable writing style on the examination, providing the bar examiners with the opportunity to intentionally discriminate against black examinees, and hence raising a fact issue as to whether they had actually done so.

■ In opposing a motion for summary judgment, a party is entitled not only to have the facts viewed in the light most favorable to it but also to all reasonable inferences which may be drawn from these facts. Harvey v. Great Atlantic & Pacific Tea Co., 5 Cir. 1968, 388 F.2d 123, 124–25; Liberty Leasing Co. v. Hillsum Sales Corp., 5 Cir. 1967, 380 F.2d 1013, 1014–15. The inferences the non-moving party seeks to draw, however, must be "reasonable," and it is in this respect that we find Dr. Dillard's deposition insufficient to controvert appellees' properly supported motion for summary judgment.

■ A major reason is that the deposition itself directly contradicts both inferences appellants would have us draw from it. In response to questioning by appellees' counsel regarding the racial uniqueness of Black English, Dr. Dillard testified that the incidence of the dialect was not limited to blacks, but was, in his words, "a major factor that differentiates so-called Southern dialect." He specifically testified that some southern whites would use similar or identical grammatical construction and that for those whites who had learned this patois in their youths, "[t]he trends of reversion are the same, of course." On the issue of the dialect's racial recognizability, Dr. Dillard testified that it was highly unlikely that an individual untrained in linguistics would recognize the use of Black English as a "black" characteristic, or indeed as anything other than incorrect standard English.[3] Both of these observations, which are in direct contradiction to the use of Dr. Dillard's linguistic theories which appellants wish to make in this lawsuit, in our view render the inference that Black English presents a viable opportunity for the Board to engage in overt racial discrimination unreasonable as a matter of law.

■ Two other factors support this conclusion. First, in determining whether a factual inference a party seeks to draw is a reasonable one, we need not ignore the existence of other evidence of record which tends to make that inference more or less plausible. First Nationl Bank v. Cities Service Co., 1968, 391 U.S. 253, 284–86, 88 S.Ct. 1575, 20 L.Ed.2d 569. Here, such relevant record evidence is the MBE, which has comprised one-half of the Georgia bar examination since February, 1972. The significance of the MBE, as a multiple choice test, is that its scores are immune to any variation arising from the use of Black English.[4] After perusing the

---

3. Appellants also contend that Black English may result in overt discrimination even if the examiner does not recognize its use as a racial characteristic but merely reacts negatively because he conceives it to be incorrect. As this claim is equally susceptible to all of the other reasons we cite for concluding that no material issue of fact exists on this claim, we need not address ourselves to its intrinsic merits.

4. Dr. Dillard specifically testified that a background in Black English would have no adverse effect on an educated individual's comprehension of even very difficult standard English.

MBE results, the district court observed that on the July, 1972 examination, when each of the 40 black applicants failed, only one passed the MBE but failed the examination as a whole. It also noted that the results on subsequent examinations were comparable and that the director of testing of the NCBE had testified that it would be impossible for a state board of examiners to set the cutoff score so as to intentionally achieve this result. Obviously, these facts also tend to seriously undercut the inference that the difficulty of black applicants on the examination is due to language bias arising from the use of Black English. In the words of the Supreme Court in *First National, supra,* they "conclusively show that the facts upon which [appellants relied] to support [their] allegation were not susceptible of the interpretation which [they] sought to give them." 391 U.S. at 289, 88 S.Ct. at 1593.

Finally, this is not a case where the substitution of speculative inferences for the "specific facts showing that there is a genuine issue for trial" demanded by Rule 56(e) is to be treated indulgently. *See* Smith v. Local 25, Sheet Metal Workers, 5 Cir. 1974, 500 F.2d 741, 749. *Fed.R.Civ.P.* 56(f) requires that a party unable to show facts essential to his opposition present to the court the reasons for its inability to produce such evidence. Here there was not only no request for further discovery, but the record affirmatively shows that appellants were furnished with the examination papers written by all applicants on the July, 1972 examination. Thus, were there more than surmise to the asserted connection between Black English and the poor showing of black bar applicants, appellants had both the means and the duty to bring the pertinent facts forward. Their failure to do so cannot be construed as creating a fact issue precluding summary judgment.[5]

## II. INHERENT DISCRIMINATION

Appellants' second contention is that, irrespective of intent, the Georgia bar examination inherently denies equal protection of the laws to black applicants because of the much greater rate at which they fail the examination. The two major issues that we must resolve in connection with this claim are: 1) the standard of judicial review which is applicable when only disparate performance by race has been shown, and 2) whether a material issue of fact remains that the applicable standard had been satisfied. As is frequently the case in equal protection suits, the first issue largely controls the second.

The district court determined that the appropriate standard of review was the "rational relationship" test, and that the Georgia bar examination satisfied this norm as a matter of law. For reasons that shall appear, we agree with the district court's ultimate conclusion on both points.

■ Appellants' primary suggestion is that we should not view the Georgia bar examination within the framework of traditional equal protection analysis at all, but should instead apply by analogy the standards developed by the Equal Employment Opportunity Commission for employment testing covered by Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C.A. § 2000e (EEOC guidelines). As construed by the Supreme Court in Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, Title VII precludes the use of testing procedures which disproportionately exclude protected minorities, regardless of intent or motivation, unless they are "demonstrably a reasonable measure of job performance." *Id.* at 436, 91 S.Ct. at 856. Under the pertinent EEOC guidelines, which we have recognized to be a highly persuasive interpretation of Title VII, United States

---

**5.** Appellants also argue that we may find the bar examiners guilty of "intentional" discrimination merely for having continued to administer the examination with knowledge of its adverse impact on black applicants. This is of

course no more than a sophisticated restatement of the claim that the bar examination is inherently unconstitutional, which we treat in Part II, *infra.*

v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906, 913,

> [t]he use of any test which adversely affects hiring, promotion, transfer or any other employment or membership opportunity of classes protected by Title VII constitutes discrimination unless: (a) the test has been validated and evidences a high degree of utility as hereinafter described, and (b) the person giving or acting upon the results of the particular test can demonstrate that alternative suitable hiring, transfer or promotion procedures are unavailable for his use.

29 C.F.R. § 1607.3 (1974). Since it is undisputed that the Georgia bar examination has a greater adverse impact on black applicants than on whites and has never been the subject of a professional validation study, acceptance of appellants' suggested standard of review would inexorably compel the conclusion that the examination is unconstitutional.

Title VII does not apply by its terms, of course, because the Georgia Board of Bar Examiners is neither an "employer," an "employment agency," nor a "labor organization" within the meaning of the statute. 42 U.S.C.A. § 2000e. Nonetheless, appellants argue that it is appropriate to look to Title VII and its implementing guidelines to flesh out the fourteenth amendment equal protection guarantee both because the statute and the amendment share the common goal of interdicting racial discrimination and because the bar examination is in reality an "employment test;" indeed, they point out that the stakes are much higher than in an ordinary employment testing situation because failure results not in the loss of a specific job opportunity but in denial of the right to practice law in an entire state.

Quite understandably, appellees take the position that whether or not the bar

examination meets the standards of a facially inapplicable statute is simply irrelevant to its constitutionality. This observation would ordinarily be all the discussion the point would warrant. However, as authority for their argument that Title VII and the fourteenth amendment should be equated, appellants have cited to us a number of Courts of Appeals decisions from other Circuits which have utilized the fourteenth amendment to apply Title VII and the EEOC guidelines virtually verbatim to employment tests administered by various public agencies.[6] We have given these decisions careful consideration, but on close analysis we conclude there are several fundamental reasons why their principles cannot be extended to reach the Georgia bar examination as appellants suggest.

The first of these reasons is that, viewed in the perspective of their somewhat unique factual context, the cases on which appellants rely do not necessarily stand for the sweeping propositions for which they cite them. The courts which have treated the fourteenth amendment and Title VII as embodying fungible standards have done so only in the narrow context of employment tests administered by governmental entities such as police and fire departments. This is significant because Title VII, as originally enacted, provided a specific exemption from the Act's requirements for governmental units. Thus, in suits involving challenges to the personnel practices of public agencies, courts were frequently confronted by the anomalous situation of a public employer who was theoretically free to engage in selection practices which would be clearly illegal for a private employer under Title VII. But prior to the time of appellate decision in each of these cases but *Carter v. Gallagher, supra,* this anomaly had been

---

6. Douglas v. Hampton, D.C.Cir. 1975, 512 F.2d 976; Davis v. Washington, D.C.Cir. 1975, 512 F.2d 956; Walston v. County School Board, 4 Cir. 1974, 492 F.2d 919; United States v. Chesterfield County School Dist., 4 Cir. 1973, 484 F.2d 70; Castro v. Beecher, 1 Cir. 1972, 459 F.2d 725; Chance v. Board of Examiners, 2 Cir. 1972, 458 F.2d 1167; Carter v. Gallagher, 8 Cir. 1971, 452 F.2d 315, *mod.* 1972, 452 F.2d 327 (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338.

potentially removed by Congress' enactment of the Equal Employment Opportunity Act of 1972, Pub.L. 92–261, 86 Stat. 103, which deleted the governmental exemption from Title VII and clearly expressed Congressional intent to reach the employment practices of the agencies in question; however, direct Title VII relief was still barred by the fact that the complaints had been filed prior to the 1972 amendments to the Act.

The response of some courts was to bridge this gap by virtually incorporating Title VII and the EEOC guidelines into the fourteenth amendment. Whatever the justification for this approach in these narrow circumstances, we think it overly simplistic to read these decisions, as appellant would have us do, as authority for the general proposition that Title VII and the equal protection clause should be read interchangeably whenever the goals to be served are the same and the subject matter is at least arguably related, particularly when the decisions have not been read so broadly by the Circuits that rendered them.[7].

A second important consideration is that the cases on which appellants rely do not state the controlling law of this Circuit, but are in fact contrary to it. We confronted the issue of testing for public employment in Allen v. City of Mobile, 5 Cir. 1972, 466 F.2d 122, which involved a challenge to the constitutionality of a written test used by the Mobile, Alabama police department as part of its requirements for promotion to the rank of sergeant. The district court sustained this test despite a showing of demonstrable adverse impact on blacks. In doing so, it recognized the relevance of *Griggs'* holding that tests which disadvantage minorities should be job-related, but declined to use this as a springboard to apply the full panoply of EEOC guidelines to a test falling outside the scope of Title VII; it specifically refused to require that the test be professionally validated. Instead, the court personally examined the challenged test and con-

cluded that the skills it measured, such as reading and comprehension, memory, note-taking and verbal skills, were useful attributes for a policeman, particularly one in a supervisory position. Based on this conclusion, it upheld the test on the ground that "[i]t bears a rational relationship to the ability to perform the work required." Allen v. City of Mobile, S.D.Ala.1971, 331 F.Supp. 1134, 1146.

On appeal, the sole issue was whether the district court had applied the correct legal standard in dealing with the test. We affirmed *per curiam,* on the basis of the district court's order and decree. Moreover, Judge Goldberg's dissenting opinion removed any remaining doubt that, in affirming, we squarely confronted and rejected the contention that Title VII and its implementing EEOC guidelines were applicable to testing outside the scope of the Act. In an exhaustive opinion, Judge Goldberg argued that the majority had erred in declining to follow precisely the cases on which appellants rely and in refusing to hold, as had they, that Title VII standards may be applied by analogy through the fourteenth amendment.

Thus, were the precise issue decided by the cases on which appellants rely before us today, we would be compelled to reject their holdings on the authority of our decision in *Allen.* See McClure v. First Nat'l Bank, 5 Cir. 1974, 497 F.2d 490, 492. Needless to say, this fact also makes appellants' cases somewhat less than persuasive authority in this Circuit.

However, even were we not constrained by *Allen,* we would view a subsequent Supreme Court decision, which declined the opportunity to equate the equal protection clause and Title VII in a similar situation, as the most persuasive authority on the proper relationship between the Act and the fourteenth amendment. In Geduldig v. Aiello, 1974, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256, the Supreme Court dealt with the question of whether the California Unemployment Compensation Disability

---

7. See note 9, *infra.*

Fund could, consonantly with the equal protection clause, exclude disabilities associated with normal pregnancy from the fund's coverage. While this state-administered plan was outside the scope of Title VII, as is the Georgia bar examination, this precise issue was the subject of an EEOC regulation promulgated pursuant to Title VII, which stated in pertinent part that ". . . payment under any . . . temporary disability plan . . . ., formal or informal, shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities." 29 C.F.R. § 1604.-10(b)(1974)

The Supreme Court, however, concluded that since normal pregnancy is an objectively identifiable physical condition, distinctions involving pregnancy do not constitute sex-based classifications unless they are shown to be mere pretexts for invidious discrimination against one sex or the other. By applying the rational relationship test, the Court then found that California's exclusion of such disabilities from the fund's coverage was consistent with the equal protection clause. But perhaps more significant than its holding is the fact that, in reaching its conclusion that "this case is thus a far cry from cases . . . involving discrimination based on gender as such," *Id.* at 496 n. 20, 94 S.Ct. at 2492, the Court felt it necessary neither to distinguish nor even to mention the EEOC's contrary view under Title VII, even though under appellants' suggested analysis the EEOC guideline would have conclusively established that the exclusion of pregnancy related disabilities constituted illegal sex discrimination. In our view, the unmistakable import of the Supreme Court's method of analysis is that a *constitutional* challenge to a method of classification must be decided by *constitutional* standards, and that while the EEOC guidelines are entitled

to great deference in determining what Congress intended to accomplish through Title VII, Albemarle Paper Co. v. Moody, 1975, —— U.S. ——, 95 S.Ct. 2362, 45 L.Ed.2d 280, they do not carry similar weight in interpreting the minimum commands of the fourteenth amendment.

Our reading of this decision is in accord with recent decisions of other Circuits. As might be expected, the continuing viability of the EEOC temporary disability guidelines following *Geduldig* was drawn into question by a number of employers who argued essentially the other side of the coin appellants urge here; *i. e.*, since differing treatment of pregnancy-related disabilities is not invidiously discriminatory for the purposes of the equal protection clause, neither should it be considered discriminatory for the purposes of Title VII. To date, this contention has been considered by the Second, Third, and most recently, the Fourth Circuits; all have rejected the facile equation of Title VII and the fourteenth amendment. As the Second Circuit put it:

> Title VII is legislation of this nature, designed to prohibit a broad spectrum of discriminatory evils which Congress deemed would have such an adverse effect. There is no requirement that the discriminatory practices forbidden by this statute should be limited to practices violative of the Equal Protection Clause. *Practices forbidden by Title VII and the EEOC guidelines issued thereunder may, nonetheless, be able to survive Equal Protection attack.*

Communications Workers of America v. American T. & T., 2 Cir. 1975, 513 F.2d 1024, 1031 (emphasis added). *Accord,* Wetzel v. Liberty Mutual Ins. Co., 3 Cir. 1975, 511 F.2d 199, *cert. granted,* 421 U.S. 987, 95 S.Ct. 1989, 44 L.Ed.2d 476; Gilbert v. General Electric Co., 4 Cir. 1975, 519 F.2d 661.[8] This is of course the crux of our refusal to measure the

---

8. Although not necessary to our reliance on them, each of these decisions also found the EEOC guidelines on treatment of pregnancy related disabilities to be a valid interpretation of Title VII.

constitutionality of the Georgia bar examination by Title VII standards.[9]

■ But because we find no basis for holding that a bar examination must be professionally validated or that bar examiners are required to demonstrate the unavailability of alternative means of measuring professional competence, *see* 29 C.F.R. § 1607.3 (1974), does not mean that the "job-relatedness" of an examination has no relevance to its constitutionality. The hallmark of a rational classification is not merely that it differentiates, but that it does so on a basis having a fair and substantial relationship to the purposes of the classification. Reed v. Reed, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225. What we do hold, however, is that the necessary relationship must be determined by constitutional, not statutory, standards.[10]

■ Assuming we find that traditional methods of equal protection analysis are applicable, appellants alternatively contend that the correct standard of review is not the "rational relationship" test relied on by the district court, but the "compelling state interest" test utilized when state action creates a racial or other "suspect classification" or impinges on a judicially-declared "fundamental interest." The gravamen of their argument is that the disproportionate passing rates of black and white applicants on the examination serve to create the classification based on race which is needed to trigger strict judicial scrutiny. The difficulty with this position, however, is that it stands in the face of a clear body of law holding that an otherwise legitimate classification does not become constitutionally "suspect" simply because greater numbers of a racial minority fall in the group disadvantaged by the classification. Jefferson v. Hackney, 1972, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285; James v. Valtierra, 1971, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678. *Cf. Geduldig v. Aiello, supra* (pregnancy not necessarily a sex-based classi-

fication even though only women may become pregnant).

*James,* for example, concerned the constitutionality of a California constitutional provision which required approval by referendum for low-income housing projects. One of the plaintiffs' primary strategies in attacking this constitutional provision was to attempt to bring it within the ambit of Hunter v. Erickson, 1969, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616, which only two years before had struck down a city charter amendment requiring voter approval of certain antidiscrimination ordinances on the ground that the amendment created a classification based on race. The *James* plaintiffs argued, successfully at the three-judge court level, that the California provision likewise created a racial classification because of the high statistical correlation between the poor and racial minorities. The Supreme Court, however, rejected the analogy and reversed, stating:

Unlike [*Hunter*], it cannot be said that California's Article XXXIV rests on "distinctions based on race." Id., at 391, 89 S.Ct. [557] at 561. The Article requires referendum approval for any low-rent public housing project, not only for projects which will be occupied by a racial minority. And the record here would not support any claim that a law seemingly neutral on its fact is in fact aimed at a racial minority. *Cf. Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). The present case could be affirmed only by extending *Hunter,* and this we decline to do.

402 U.S. at 141, 91 S.Ct. at 1333.

Likewise, in *Jefferson v. Hackney, supra,* the Court brushed aside the "naked statistical argument" that it was unconstitutional to fund an AFDC program at a lower percentage of recognized need than other categories of assistance because of the higher percentage of minor-

---

**9.** Significantly, two of the Circuits on whose decisions appellants rely are among the three which have refused to equate Title VII and the

fourteenth amendment in interpreting *Geduldig.*

**10.** See text accompanying note 11, *infra.*

ity recipients in the AFDC category with the observation that

> [t]he acceptance of appellants' constitutional theory would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be. Few legislative efforts to deal with the difficult problems posed by current welfare programs could survive such scrutiny, and we do not find it required by the Fourteenth Amendment.

406 U.S. at 548–49, 92 S.Ct. at 1732.

Appellants seek to avoid the thrust of these decisions by arguing that they are distinguishable as "social welfare" decisions. Noting that the Supreme Court has frequently held that states are to be allowed greater latitude in formulating economic and social welfare policy than in other areas, *Geduldig, supra,* 417 U.S. at 495, 94 S.Ct. 2485; Dandridge v. Williams, 1970, 397 U.S. 471, 486–87, 90 S.Ct. 1153, 25 L.Ed.2d 491 they remind us that the right to practice law in Georgia is not a resource which the state may either conserve or allocate. However, this purported distinction misses the point. The difference between economic and social welfare cases and others lies in the precision with which the state is required to draw classifications in seeking to achieve its objectives, and not in the amount of adverse impact on minority groups which is permissible before an otherwise legitimate classification becomes constitutionally "suspect."

Thus, for example, a state may constitutionally presume that widows are more in need of financial assistance than widowers when legislating a property tax exemption, Kahn v. Shevin, 1974, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189, or that AFDC recipients require a lower percentage of need than those in other categories of assistance, *Jefferson v. Hackney, supra,* despite the fact that these classifications are demonstrably both over- and underinclusive; however, a state may not similarly assume that men make better estate administrators than women in the sole interest of eliminating a class of contests for letters of administration. *Reed v. Reed, supra.* But, no one would seriously contend that any economic resource, however, scarce, could be conserved by denying its benefits outright to a racial or other suspect minority. *See* Shapiro v. Thompson, 1969, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 ("The saving of welfare costs cannot justify an otherwise invidious classification.") However, since Georgia bar examinees are not judged on the basis of broad generalizations, but rather on the basis of individualized determinations of whether each applicant possesses the minimal competence required to practice law, the "social welfare" distinction simply has no significance in this case.

■ The foregoing of course does not mean that any facially neutral method of classification automatically escapes more than minimal judicial scrutiny. An apparently neutral scheme may be merely a subterfuge for invidious discrimination, Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, or may be discriminatorily applied, Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. Moreover, in appropriate cases this Court has held that statistical evidence of disparate racial impact alone may establish a *prima facie* case of racial discrimination, shifting to the defendant the burden of demonstrating that invidious discrimination was not among the reasons for his actions. *Compare* Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687 with Robinson v. City of Dallas, 5 Cir. 1975, 514 F.2d 1271. However, we need not decide if this is a case where "statistics . . . tell much, and Courts listen," Alabama v. United States, 5 Cir. 1962, 304 F.2d 583, 586, *aff'd per curiam,* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112, because of our prior conclusion that appellees have carried their burden under *Fed.R.Civ.P.* 56 of demonstrating the absence of any genuine issue of material fact regarding intentional racial discrimination. Thus, even were we to assume that the burden of proof has shifted, it must also be deemed to have been met.

Since the Georgia bar examination does not establish a constitutionally suspect racial classification and no claim is made that a fundamental interest is involved, there is no legal basis for applying the compelling state interest test and the proper standard of review becomes the rational relationship test utilized by the district court. Appellants nonetheless urge that the district court, which relied mainly on Schware v. Board of Examiners, 1957, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 as authority for its standard of review, erred in failing to apply what they term the somewhat stricter burden of rationality exemplified by more recent decisions such as *Reed v. Reed, supra*, on the ground that the racial discrimination involved in this case is even more highly suspect than the gender-based discrimination in *Reed*.

Appellants' argument for invoking *Reed* is, of course, specious. As the Supreme Court succinctly stated in *Jefferson, supra*, 406 U.S. 535, 547, 92 S.Ct. 1724, 1732: "The standard of judicial review is not altered because of appellant's unproved allegations of racial discrimination." This is not to say that *Reed* has no relevance to this appeal; however, its significance is of little comfort to appellants. In our view, *Reed* and related decisions such as Frontiero v. Richardson, 1973, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583, serve to reemphasize the desirability and relative relationality, at least outside the area of economic and social welfare programs, of classifications which act directly upon the quality they purport to measure as compared to classifications which attempt to achieve their intended objectives through indirection, often by the use of ill-fitting and stereotyped generalizations. Since, as we have previously noted, the Georgia bar examination provides an individual, anonymous determination of each applicant's present competence to practice law, it comports with this aspect of the teaching of *Reed* and its progeny. Accordingly, the existence of these intervening decisions in no way denigrates the district court's reliance on the Supreme Court's earlier statement in *Schware, supra*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796, that "[a] state can require high standards of qualification such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law," as its source of authority for the appropriate standard of review.

Appellant's final argument regarding inherent discrimination is that, even if we should find the district court adopted the correct standard of review, it improperly resolved disputed issues of fact in reaching its conclusion that the bar examination possesses a rational connection with an applicant's fitness to practice law. This contention is simply devoid of merit.

Appellants concede, as they must, that the state has a legitimate and substantial interest in excluding from the practice of law those persons who do not meet its standards of minimal competence and that the Georgia examination, as presently constituted, tests skills and knowledge which have a "logical, apparent relationship" to those necessary to the practice of law.

While appellants valiantly argue otherwise, these facts are sufficient in themselves to establish the rationality of the bar examination in the constitutional sense. If a state has the right to insist on a minimum standard of legal competence as a condition of licensure, it would seem to follow *a fortiori* that it may require a demonstration of such competence in an examination designed to test the fundamental ability to recognize and deal with legal principles.

Another important indicium of rationality is that the Georgia bar examination satisfies the two criteria of a rational examination we identified in Armstead v. Starkville Municipal Separate School Dist., 5 Cir. 1972, 461 F.2d 276, in which we held the Graduate Record Examination to be an unconstitutional method for selecting primary and secondary school

teachers. There we suggested that a rationally supportable examination should 1) be designed for the purpose for which it is being used, and 2) utilize a cutoff score related to the quality the examination purports to measure. The Georgia bar examination meets both qualifications. Both the essay and MBE portions of the examination are designed solely to assess the legal competence of bar examinees; and while the minimum passing score of 70 has no significance standing alone, it represents the examiners' considered judgments as to "minimal competence required to practice law," the precise quality the examination attempts to measure.[11]

The disputed fact issues which appellants claim necessitate a trial, such as whether the bar examination covers a sufficiently broad domain of subject matter or tests an adequate range of legal skills, are at bottom only claims that the examination could be improved. While the difference between minimal and strict scrutiny is necessarily a matter of degree, this argument overlooks one of the most fundamental distinctions between the two standards of review— the relevance of the availability of alternative means. While a party defending a classification subject to strict judicial scrutiny must demonstrate that the state has no other available alternative which impinges less on the protected interest involved, *see, e. g.*, Shelton v. Tucker, 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231, the focus of the rational relationship test is not whether the state has superior means available to accomplish its objectives, but whether the means it has chosen is a reasonable one. Viewed from this perspective, appellants' asserted "fact issues" are simply not material.

The same observation applies to appellants' contentions that the bar examination is irrationally administered

because its outcome depends so heavily on the subjective grading judgments of the examiners. Since subjective, as opposed to objective, grading is a necessary corollary to the administration of essay-type questions, an attack on subjective grading *per se* must perforce include the allegation that the use of essay examinations is itself irrational. This contention has uniformly been rejected by the courts which have considered it, for reasons succinctly articulated in an unreported opinion granting partial summary judgment in one of the consolidated actions comprising this appeal. There the court said:

> The relevant question must then be whether the passing of an examination made up of subjective, essay-type questions has a rational connection with the applicant's ability to practice law in the State of Georgia. It is beyond question that it does. While plaintiff would apparently favor a more objective type of examination, much of an attorney's actual work once admitted into practice involves the analysis of complicated fact situations and the application thereto of abstract legal principles. Both in legal practice and with these essay-type questions, recognition of the legal problem presented and well-reasoned explication of the relevant considerations is of utmost importance.

Banks v. Miller, Civil No. 15876 (N.D.Ga., August 11, 1972) (footnote omitted). *Accord*, Whitfield v. Illinois Board of Law Examiners, 7 Cir. 1974, 504 F.2d 474, 477; Feldman v. State Board of Law Examiners, 8 Cir. 1971, 438 F.2d 699, 703; Chaney v. State Bar of California, 9 Cir. 1967, 386 F.2d 962, 964, *cert. denied*, 1968, 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162. Appellants' further arguments that the examiners should uniformly be required to use model answers and pre-determined standards in grading

---

11. *See also* Baker v. Columbus Municipal Separate School Dist., 5 Cir. 1972, 462 F.2d 1112, 1114–15. While appellants suggest that there is language in *Baker* which indicates that strict scrutiny is generally applicable to qualifying

examinations, the basis of our holding there was the affirmance of an explicit finding of purposeful racial discrimination. For this reason, the compelling state interest test was the appropriate standard of review in *Baker*.

are again merely suggestions for improvement, and do not raise a fact issue as to whether the examination itself is rational.

Finally, we flatly reject appellants' contentions that the Board's practice of regrading failing papers falling close to the passing mark, or of comparing examination results with law school records as an informal check on the examiners' performance, is evidence of the irrationality of the examination. We fully agree with the statement in appellees' brief that "[t]he Constitution does not require a perfect test nor should it require the examiners to act as if the test were perfect." Indeed, it is curious logic to condemn the examiners for utilizing practices designed to recognize the inherent limitations of testing and for attempting to give the benefit of the doubt to applicants who may have been adversely affected by those limitations. Similarly, we see no infirmity in the fact that the standards for determining which papers are to be regraded are not fixed and immutable and may depend in part upon the exercise of an examiner's discretion.

Nor do we find it irrational for the examiners to compare examination results with law school records as one informal, after-the-fact means of judging the quality of the examination. Since Georgia as well as other states requires graduation from law school or its equivalent as a prerequisite to taking the bar examination, a requirement which appellants do not challenge here, it is certainly reasonable to assume that legal training is highly instrumental in developing the qualities that comprise "minimal competence to practice law" and that the overall performance of graduates of various institutions bears some logical relevance to how well the examination is measuring these qualities. The fact remains, of course, that each applicant's examination is graded without knowledge of his particular legal background. Accordingly, we have no hesitancy in affirming the district court's holding that the Georgia bar examination "has a rational relationship to an applicant's fitness to practice law. . . ."

### III. DUE PROCESS REVIEW

In addition to the equal protection claims we have previously discussed, appellants also contend that the failure to provide any procedure for review of a failing grade at the behest of the examinee constitutes a denial of due process of law. The district court's view was that such review is not constitutionally required, primarily because an unqualified right to retake the examination at its next regularly scheduled administration both satisfies the purposes of a hearing and affords it protection. We agree.

The safeguards of the due process clause are of course available to a failing bar applicant. As the Supreme Court stated in *Schware, supra:*

A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.

535 U.S. at 238–39, 77 S.Ct. at 756.

While the opportunity to be heard is generally considered a fundamental component of due process, entitlement to a hearing does not automatically flow from a finding that procedural due process is applicable. *See, e. g.,* North American Cold Storage Co. v. Chicago, 1908, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195. As the Supreme Court observed in Hannah v. Larche, 1960, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307:

"Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on

that proceeding, are all considerations which must be taken into account.

 In the first instance, whether due process requires a particular procedure in a given situation must be determined by balancing the individual's interest in avoiding the loss which lack of the procedure inflicts upon him against the interests which the government seeks to advance by denying it. Goldberg v. Kelly, 1970, 397 U.S. 254, 262–63, 90 S.Ct. 1011, 25 L.Ed.2d 287. In arguing that this balance should be struck in favor of allowing a failing bar examinee a hearing, appellants rely heavily on an applicant's undoubted interest in pursuing his chosen profession. But such reliance misses the mark. While this interest is admittedly a weighty one in determining whether due process protections are applicable, see Atlanta Attractions, Inc. v. Massell, N.D.Ga.1971, 332 F.Supp. 914, aff'd, 5 Cir. 1972, 463 F.2d 449, it militates similarly in favor of a hearing only if hearings are demonstrably more efficacious means of safeguarding that interest than the unqualified right of reexamination which Georgia currently provides. We think they are not.

First, since regularly scheduled examinations are held every six months, and each administration of the examination produces scores of unsuccessful applicants who would be entitled to hearings, we think it unlikely that providing a hearing would afford significantly quicker relief to an erroneously failed applicant than would the right to retake the examination at its next administration.

Second, we think it likewise unlikely that a hearing would be significantly more effective in exposing grading errors than would reexamination. At a hearing, the issue of course would not be whether the examiner had given an applicant the "correct" grade, but rather whether either a mechanical error had been made in computing the grade or the grade given by the examiner was arbitrary, capricious, and without foun-

dation. Since "it is not to be presumed that powers conferred upon the administrative boards will be exercised arbitrarily," Douglas v. Noble, 1923, 261 U.S. 165, 170, 43 S.Ct. 303, 305, 67 L.Ed. 590, we may presume that such errors are infrequent. Even making the generous assumption that one out of every hundred applicants who take the examination fail when they should have passed due to arbitrary grading, the probability that the same individual would be the victim of error after two reexaminations is literally one in a million.[12] Since the hearing process is itself susceptible to error, we see little advantage to it on this score.

The one area in which a hearing would appear to be a superior remedy to reexamination is in removing whatever stigma may attach to an individual from having previously failed the bar examination in the rare case where the failure was unjustified. Such undeserved stigma, however, is not only rare but far removed factually from that occasioned by the public "posting" as a drunkard which was involved in Wisconsin v. Constantineau, 1971, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515; but more important, it also presents entirely different issues than those involved when an individual is denied admission to the bar on the ground of moral unfitness. See Willner v. Committee on Character and Fitness, 1963, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224. While an adverse determination on character and fitness tends to exert a continuing detrimental effect on an individual's opportunity to be admitted to practice, unless and until rebutted, failure on a bar examination does not stigmatize an individual as "incompetent," but merely indicates that he did not demonstrate minimal competence on a particular examination. Upon reexamination, such an individual is entitled to have his paper graded by the same standards as those of everyone else, and if he passes, to be admitted on precisely the same basis as an applicant who had not

12. See Comment, Review of Failing Bar Examinations: Does Reexamination Satisfy Due Process?, 52 *Bos.U.L.Rev.* 286, 301 N. 115.

previously taken the examination. For these reasons, we consider the "liberty interest" a failing examinee has at stake to be a minor, if not a non-existent one. *Cf.* Sims v. Fox, 5 Cir. 1974, 505 F.2d 857, 862–64 (en banc).

In contrast, we find the interests which the state seeks to advance by substituting reexamination for a hearing to be substantial. The most important of these interests is, of course, avoidance of the administrative burden which a hearing requirement would entail. Since, as we have noted, scores of applicants fail the Georgia bar examination each time it is given, and all examiners are involved in the grading of each paper, the result of requiring a hearing would be the imposition of what the Seventh Circuit has described as "an intolerable burden upon the bar examiners," Whitfield v. Illinois Board of Bar Examiners, 7 Cir. 1974, 504 F.2d 474, 478, especially when one considers that bar examiners are not full-time administrators but practicing attorneys. While such administrative concerns are not in themselves controlling, they are certainly relevant, Richardson v. Perales, 1971, 402 U.S. 389, 406, 91 S.Ct. 1420, 28 S.Ct. 842, and become particularly so when the gains to be realized through the imposition of an additional administrative burden are as minimal as they are here. Moreover, as *Whitfield, supra,* has observed, the initiation of a hearing requirement as a supplement to, rather than as a substitute for, the right of reexamination (as we are certain appellants view their due process claim) might result in unfair disadvantage to those applicants taking the examination for the first time.

Finally, in weighing the "complexity of factors" which serve to shape the contours of the process which is due here, we do not write on a clean slate. The precise issue before us has been considered squarely by one Circuit, *Whitfield, supra,* 504 F.2d 474, 477–79; inferentially by another, Chaney v. State Bar of California, 9 Cir. 1967, 386 F.2d 962,

967, *cert. denied,* 1968, 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162; and in *dictum* by a third, Feldman v. State Board of Law Examiners, 8 Cir. 1971, 438 F.2d 699, 703 n. 6. All have concluded, as have we, that a hearing is not required. These decisions, which we consider sound and well-reasoned, reinforce our conviction that the balance we have struck is the proper one.

Accordingly, since the record reveals no disputed issues of material fact and the applicable principles of law clearly demonstrate that appellees are entitled to prevail, the district court's award of summary judgment to appellees is

Affirmed.

ADAMS, Circuit Judge (dissenting):

Since I believe the majority decision rests upon a tenuous resolution of pivotal factual issues in a troublesome area of the law where residual doubts at this stage of the proceedings should be resolved in favor of the plaintiffs, I must, with deference to the comprehensive opinion of the majority, dissent.

a.

My dissent is based in large measure on the nature of the uncontradicted facts which plaintiffs have advanced to establish a case of racial discrimination violative of the equal protection clause of the fourteenth amendment.[1]

The central focus of this litigation is that black applicants as a class have for a period of years experienced a severely disproportionate number of failing marks on the Georgia bar examination. As the majority opinion candidly concedes, this situation reached a nadir in July, 1972, when each of the 40 black applicants failed; and continued in February and July, 1973, when more than one-half the black applicants were unsuccessful, compared to a failure rate of one-fourth to one-third among white examinees.

---

1. The fourteenth amendment provides in part: "nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."

**1106**

### b.

The administration of a state policy that is neutral on its fact but which results in unequal application to those entitled to be treated alike is not in itself a denial of equal protection. Rather, it must be demonstrated that there is present an element of purposeful discrimination. Such purposeful discrimination, however, may be evidenced by a systematic, long-continued pattern of unequal results.[2]

A colorable case of purposeful racial discrimination is set forth where sustained *de facto* discrimination is shown together with the absence of an investigation, or indeed any effort, by the administrators of the state program in question to ascertain whether the seemingly purposeful discrimination is intentional in fact or is explainable by the circumstances.[3] This is so because a presumption of racial inferiority is simply not permissible.[4]

### c.

*Bridgeport Guard. Inc. v. Members of Bridgeport Civil Service Comm'n*[5] was a suit by nearly all the black policemen of the City of Bridgeport who had not passed a particular civil service examination. The Second Circuit held that the defendants had a heavy burden to meet the plaintiffs' *prima facie* case of invidious discrimination in view of a practice that resulted in a disparity of substantial magnitude between the hiring of whites and blacks. This Court has stated that "[w]henever the effect of a law or policy [use by school district of a 1,000 cut-off score in the National Teachers Examination as a condition of employment] pro-

duces . . . a [significant] racial distortion it is subject to strict scrutiny."[6]

Based on a fair reading of the pleadings and the depositions here—with all inferences resolved in favor of the plaintiffs, as required on summary judgment—it would appear that the defendants have not met their burden of disproving purposeful discrimination in the application of the Georgia bar examination.

The plaintiffs have raised the question whether black examinees, although initially anonymous, can be racially identified by graders of the essay portion of the examination because of the use of "Black English." As the majority properly points out, proof of identification of bar examinees by race may be difficult. However, the difficulty of proof does not eliminate its possibility. Surely such difficulty, without more, should not bar, in the context of this case, affording the plaintiffs the opportunity of offering any such evidence at trial.

In addition, the use of the objective MBE in combination with the essay examination raises a question of the weight accorded each when the examiners come to the point of ascertaining final grades. Also, the selection of cut-off scores, especially when such selection is not subject to review, may be arbitrary. The legality of such decisions may not properly be resolved by mere reference to the good faith judgment of the bar examiners.[7]

### d.

The reliance by the district court and the majority on *Schware v. Board of Bar Examiners*[8] would appear to be mis-

**2.** *Snowden v. Hughes*, 321 U.S. 1, 8–9, 64 S.Ct. 397, 88 L.Ed. 497 (1943).

**3.** *Hill v. Texas*, 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); *Hawkins v. Town of Shaw*, 437 F.2d 1286, 1288 (5 Cir. 1971), *modified en banc on other grounds*, 461 F.2d 1171 (1972); *see Armstead v. Starkville Municipal Separate School Dist.*, 461 F.2d 276, 279–280 (5 Cir. 1972).

**4.** *Brown v. Allen*, 344 U.S. 443, 471, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

**5.** 482 F.2d 1333, 1337 (2d Cir. 1973).

**6.** *Baker v. Columbus Municipal Separate School District*, 462 F.2d 1112, 1114 (5 Cir. 1972).

**7.** *Id.* at 1114. I do not mean by this statement to impugn the integrity of the examiners. Rather, I suggest only that it is not appropriate to foreclose an attempt by plaintiffs to establish this fact.

**8.** 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957).

placed. *Schware* dealt with the case of a single, white law school graduate denied the right to take the New Mexico bar examination on the ground that he was "morally unfit." The Supreme Court decided that the New Mexico bar examiners did not have a rational basis for denying the plaintiff that right. The Court was not called upon to consider the question whether more than a rational basis for denying admission to the bar examination to Schware was required.

e.

The EEOC guidelines for employment testing [9] and the principles enunciated in *Griggs v. Duke Power Co.* [10]—both of which require a validation of a suspect employment test—are at least persuasive as to the criteria to be applied to the Georgia bar examination under the facts of this case. As plaintiffs point out, the examination here, although not administered by an "employer" for the purpose of hiring, is for all practical purposes an employment test. The applicant who fails it may not, in any respect, be employed to practice law within the state.

Moreover, the philosophy underlying the Civil Rights Act would appear to encompass this type of examination. As the Supreme Court pointed out in *Griggs*: "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." [11]

The majority declares that *Allen v. Mobile* [12] does not permit the *Griggs* standard to be applied in an area other than that to which the Civil Rights Act is expressly directed. In *Allen* this Court, without referring to *Griggs* or the EEOC guidelines, affirmed *per curiam* the decision of the district court judge, reached after trial, that an alleged discriminatory written test used for promoting police officers was reasonably or rationally job-related. Judge Goldberg dissented on the ground that the district court, and the majority in affirming the district court, had misconstrued the standard *Griggs* required. [13] Neither the *per curiam* affirmance of the trial court's holding in itself nor the *per curiam* as clarified by the dissent warrants a rejection out of hand of any utilization whatever of either the *Griggs'* standard or the EEOC guidelines.

f.

Nor do I believe that the recently decided *Geduldig v. Aiello*, [14] relied on by the majority, is in any way controlling. The facts and governing law of *Geduldig* are substantially distinguishable from those here. The California unemployment compensation disability fund, which is supplementary to the state's workmen's compensation program, excludes from its coverage disabilities resulting from normal pregnancy and childbirth. The Supreme Court, in reviewing the exclusion of pregnancy and childbirth coverage, did not apply EEOC directives on pregnancy because no invidious discrimination was perceived. A state social welfare program necessarily must draw a line somewhere, the Supreme Court stated. The exclusion of one disability was not suspect where other comparable disabilities were also excluded. [15] The particular disability was sex-related but the decision to exclude it from coverage, said the Supreme Court, was not predicated on sex but on the limited financial resources available in

---

**9.** Interpreting and implementing Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C.A. § 2000e.

**10.** 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

**11.** Id. at 430, 91 S.Ct. at 853.

**12.** 466 F.2d 122 (5 Cir. 1972), *cert. denied*, 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975 (1973).

**13.** Id. at 126.

**14.** 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974).

**15.** *Compare* James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971) with Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).

the compensation fund. Such reasoning is not apposite here.

### g.

Plaintiffs in this case have established what amounts to an exclusion from job opportunities of a disproportionate number of blacks. These facts call for a stricter standard of review than the standard the majority approves today. Of even more significance, in a case of this importance where one of the key factors in determining illegality will be the evaluation of motive, it seems particularly inappropriate to employ the device of summary judgment.[16] Summary judgment may be used only when no genuine issues of fact remain unresolved.

For all the reasons pointed out above, I would reverse the grant of summary judgment and remand the case to the district court for a trial on the merits.

---

**16.** Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).