**Alvin Dwight PETTIT et al.**

v.

**Vincent L. GINGERICH, Chairman et al.**

**Civ. No. B–72–964.**

United States District Court,
D. Maryland.

Feb. 22, 1977.

Kenneth L. Johnson and Alvin Dwight Pettit, Baltimore, Md., and Jack Greenberg and Linda Greene, New York City, for plaintiffs.

Francis B. Burch, Atty. Gen., and George A. Nilson, Deputy Atty. Gen., Baltimore, Md., for defendants.

BLAIR, District Judge.

The general question presented by this suit is whether the Maryland Bar examination is color-blind. The specific question presented is whether the seven black plaintiffs and the members of the class whom they seek to represent are being and have been deprived of any rights, privileges and immunities secured by the Constitution and laws of the United States because they have failed the Bar examination and been denied admission to practice law.

Suit is brought under 42 U.S.C. §§ 1981 and 1983 to secure rights protected by the Thirteenth and Fourteenth Amendments. The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Defendants are Vincent Gingerich, Charles Dorsey, and Dorothy Thompson, the members of the Maryland State Board of Law Examiners (Board). No question of capacity has been raised by the defendants and it is apparent that they are being sued in their official capacity. *See Burt v. Board of Trustees*, 521 F.2d 1201, 1205 (4th Cir. 1975).

Because of what they perceive and allege to be intentional and inherently discriminatory practices, plaintiffs contend that the Bar examination denies them equal protection in contravention of the Fourteenth Amendment. They support their allegations in part by alleging that the Bar examination has a disproportionately adverse impact on blacks who are severely underrepresented in the legal profession. They seek as relief (1) a declaratory judgment that defendants' testing practices are racially discriminatory and unlawful, (2) a permanent injunction against such practices, (3) attorneys' fees, and (4) other appropriate relief.

This suit was filed in September 1972 and, with the court's concurrence, the parties engaged in extensive formal and informal pre-trial procedures to develop the underlying facts. The matter is now before the court on defendants' motion for summary judgment, the issues have been fully briefed and the parties heard at oral argument. Before addressing the merits, the court will deal with various preliminary questions.

*Class Action*

■ Plaintiffs seek to maintain a class action on behalf of all blacks (a) who have taken and failed the Bar examination or (b) who have not yet taken the Bar examination or (c) who have failed the Bar examination three times or more and have been denied the opportunity to retake it or (d) who wish or will wish to practice law in Maryland. Defendants oppose certification of a class on the ground that each Bar examination is a separate event and that each is graded individually. Plaintiffs have not moved separately to certify the class.

Ostensibly, determination of whether a suit is to be maintained as a class action is to be made as soon as practicable after it is commenced. F.R.Civ.P. 23(c)(1). What is practicable must be determined within the peculiar context of each case. In this case, the court (and apparently the plaintiffs) did not move to certify a class, conditionally or otherwise, for a number of reasons. Among those reasons were the development of facts which would illuminate the propriety and scope of class certification and a determination by the court of the adequacy of representation by the named plaintiffs and their counsel.

Even where the parties fail to move for class certification commentators have suggested that the court has an independent obligation to determine the propriety of a class action. *See* Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 39–42 (1967); 7A Wright & Miller, *Federal Practice & Procedure*, Civil, § 1785 (1972 and 1976 Supp.). *But cf. Carracter v. Morgan*, 491 F.2d 458 (4th Cir.

1973) (plaintiff has primary responsibility for initiating certification of class).

The court finds that the four preconditions of Rule 23(a), F.R.Civ.P., have been met in this case. It further finds that this action falls under the provisions of Rule 23(b)(2), F.R.Civ.P. As noted earlier, the suit has been pending for over four years and has received a fair amount of public notice. There is little doubt that the affected members of the class are fully aware of the suit and the issues it presents. Class certification, in the court's view, is proper in this action and the appropriate class is hereby designated to be: all blacks who have taken and failed the Maryland Bar examination.

## Three-Judge Court

■ Defendants' answer raises the question of whether the claims in suit must be decided by a three-judge court. Title 28 U.S.C. § 2281 as it existed prior to the enactment of Pub.L. No. 94–381, effective August 12, 1976, is applicable.

Plaintiffs do not question the constitutionality of the Maryland law governing admission to the Bar. *See Annotated Code of Maryland,* art. 10, §§ 1–8 (1976); nor do they question the constitutionality of the Rule pursuant to which the Bar examination is administered. Rule 7(c) provides:

> It is the policy of the Court [of Appeals] that no quota of successful candidates be set, but that, insofar as practicable, each candidate be judged upon his fitness to be a member of the bar as demonstrated by his examination answers. To this end the examination shall be designed to test the candidate's knowledge of legal principles in the subjects in which he is examined and his ability to recognize, analyze and intelligibly discuss legal problems and to apply his knowledge in reasoning their solution. The examination will not be designed primarily to test information, memory or experience.

Rule 7(c) was apparently adopted pursuant to *Annotated Code of Maryland,* art. 10, § 3(d) (1976).

Plaintiffs' challenge is to the constitutionality of the Bar examination which is administered pursuant to these authorities. The scope of the requirement of a three-judge court has traditionally been strictly construed. *See Board of Regents v. New Left Education Project,* 404 U.S. 541, 545, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972). Since neither a state law nor an order or regulation adopted pursuant thereto is under attack, this suit may be resolved by a single judge.

## Abstention

■ Defendants argue alternatively that abstention would be appropriate in this case because the plaintiffs have available to them various state remedies. It is true that the plaintiffs may have available to them certain state remedies. What they seek in this suit, however, is not individual review of Bar examination performance but consideration of claims of racial discrimination in contravention of their federal constitutional rights. The existence of a state remedy, without more, is not sufficient to permit a federal court to abstain. *Wisconsin v. Constantineau,* 400 U.S. 433, 437–39, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). *See also Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Abstention is appropriate only when there are special circumstances. *Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975).

In *Colorado River Water Conserv. District v. United States,* 424 U.S. 800, 813–17, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Court noted three categories where abstention would be appropriate: (1) where a federal constitutional question might be mooted or presented in a different posture by state court determination of state law; (2) where the case presents difficult problems of state law implicating substantial public policy concerns; and (3) where with certain exceptions an injunction is sought to restrain state criminal proceedings or closely related civil proceedings or the collection of state taxes.

■ This case does not come within the first category. *See Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 509–13, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Askew v. Hargrave*, 401 U.S. 476, 477–78, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971) (per curiam). Plaintiffs present no state law claim nor are any uncertain issues of state law involved. There is no vague statute or administrative rule susceptible to a saving judicial construction. The statutes and rule under which the Bar examination is given are not attacked. Unlike *Reetz v. Bozanich*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), these are not unresolved questions of state constitutional law. Moreover, there is no state action pending that could resolve or modify on state grounds the claim presented. *See Harris County Comm'rs Court v. Moore, supra*.

Similarly, this case does not fall within the second category of cases in which abstention is appropriate. In those cases, as a matter of comity, abstention has been ordered where complex problems have been delegated to state regulatory agencies which have developed special expertise and sensitivity to the proper consideration of predominately local factors. *Alabama Public Service Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 348–50, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *Burford v. Sun Oil Co.*, 319 U.S. 315, 327–34, 63 S.Ct. 1098, 87 S.Ct. 1424 (1943). No subtle regulatory problems depending upon special local expertise or predominately local factors are presented in this suit.

That the suit presents no claims which would fall within the third category. requires no elaboration.

Having chosen a federal forum for adjudication of their federal constitutional claims, this court concludes that plaintiffs need not first seek relief in the state forum. *See Timmons v. Andrews*, 538 F.2d 584, 586 (4th Cir. 1976).

### Standing

■ After this suit was filed, plaintiffs Pettit and Bettis passed the Bar examination and were admitted to practice law in Maryland. Defendants argue that the suit is moot as to Pettit and Bettis and that they lack standing to remain as plaintiffs. Because only equitable relief is sought, the controversy is moot as far as Pettit and Bettis are concerned. As the Court stated in *Roe v. Wade*, 410 U.S. 113, 123, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973):

We are next confronted with issues of justiciability, standing, and abstention. Have [plaintiffs] established that "personal stake in the outcome of the controversy," *Baker v. Carr*, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962), that insures that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution," *Flast v. Cohen*, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947] (1968), and *Sierra Club v. Morton*, 405 U.S. 727, 732, [92 S.Ct. 1361, 1364, 31 L.Ed.2d 636] (1972)?

Pettit and Bettis no longer have such a personal stake in the controversy. *DeFunis v. Odergaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam); *Singleton v. Louisiana State Bar Ass'n*, 413 F.Supp. 1092, 1094 n.1 (E.D.La.1976). Moreover, this case does not present a question that is "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). *See Roe v. Wade*, 410 U.S. at 125, 93 S.Ct. 705. The fact that five named plaintiffs remain in the suit and that a class has been formed assures that the issues presented will not evade review. *See Sosna v. Iowa*, 419 U.S. 393, 397–403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Pettit and Bettis will be dismissed as plaintiffs in the suit.

### Failure to Join Party

■ Defendants also raise as a defense the failure of plaintiffs to join the Maryland Court of Appeals which makes the final decision as to whether an applicant is to be admitted to the Bar. *Annotated Code of Maryland*, art. 10, § 3(c) (1976). The Maryland Court of Appeals is not a "person" within the meaning of 42 U.S.C. § 1983. *Zuckerman v. Appellate Div., Sec.*

*Dept., Supreme Court of the State of New York*, 421 F.2d 625, 626 (2d Cir. 1970). There is nothing to indicate that complete relief could not be afforded plaintiffs without joining the Maryland Court of Appeals and defendants have advanced no specified claim of prejudice. *See* F.R.Civ.P. 19. The failure to join the Maryland Court of Appeals as a defendant is of no consequence in this case.

### Failure to Exhaust State Remedies

■ Defendants also contend that the suit should be dismissed for the failure of plaintiffs to exhaust available state remedies. Those remedies available, according to defendants, are retaking the Bar examination, filing exceptions to the adverse recommendations of the Board, and/or seeking a writ of certiorari from the United States Supreme Court to review an order of the Maryland Court of Appeals overruling an examinee's exceptions. Review by the Maryland Court of Appeals of an examination graded as unsatisfactory by the Board is provided for by rule:

> Exceptions seeking a review by the Court of Appeals of the candidate's answers to the Board's test shall be filed within the time required by section b of Rule 12 . . . . The exceptions shall be accompanied by a statement indicating (i) that the candidate availed himself of the opportunity to review his examination books and the model answers for the Board's test, and (ii) shall specify those questions and answers which the candi-

date wishes reviewed and the reasons therefor. . . .

Rule 8(b)(3) Governing Admission to the Bar of Maryland.[1] *See also id.* Rule 12(b) (time for filing exception). Exhaustion of administrative remedies is not required for § 1983 suits. *McCray v. Burrell*, 516 F.2d 357, 360–61 (4th Cir. 1975), *cert. dismissed*, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976). *A fortiori*, plaintiffs are not required to exhaust existing state judicial remedies in an action brought under § 1983. *See Timmons v. Andrews*, 538 F.2d 584, 586 (4th Cir. 1976).

### Summary Judgment and the Merits

Defendants contend that the undisputed material facts show that the Maryland Bar examination is neither intentionally nor inherently discriminatory and that it constitutes a rational and reasonable method of determining an applicant's fitness and capacity to practice law. Rule 56, F.R.Civ.P. Plaintiffs allege that genuine issues of material fact exist with respect to (1) intentional discrimination in administration of the Bar examination; (2) disparate racial impact caused by the Bar examination; (3) the opportunity available to the Board to discriminate; and (4) the accuracy of the Bar examination's measurement of fitness to practice law in the absence of any scientific validation of the test.

The principles governing consideration of motions for summary judgment are familiar but will be restated briefly at the outset of this discussion. The motion should not be granted unless the evidentiary facts are

---

1. The extent to which plaintiffs have availed themselves of these opportunities for review varies. Plaintiffs Pettit and Bettis will not be considered in light of their dismissal from this suit because of lack of standing. Plaintiff Cooper failed the winter 1972 examination, did not take an exception to the result and has not taken subsequent Bar examinations. Plaintiff Marshall took and failed the winter and summer examinations in both 1970 and 1971, the winter 1972 examination, the summer 1973 examination, and the winter 1974 examination. He has filed unsuccessful exceptions to some but not all these failures. Plaintiff McIntosh took and failed the summer 1972 examination, the winter and summer 1973 examinations and

the winter 1974 examination. He has taken no exceptions to these failures. Plaintiff Proctor took and failed the summer 1970 examination, the winter and summer 1971 examinations, the summer examinations in 1972 and 1973 and the winter 1974 examination. No exceptions were taken to these results. Plaintiff Waker took and failed the winter and summer 1973 examinations and the winter 1974 examination. An exception, which was denied, was taken to the winter 1973 examination. Plaintiffs' Amended Complaint, ¶¶ 3(b)–(f); Defendants' Answer to Amended Complaint, ¶¶ 4(b)–(f); Plaintiffs' Answers to Defendant's Interrogatories, ¶¶ 8, 10. The above review reflects data only up to the winter 1974 examination.

not in dispute and there can be no reasonable disagreement concerning the inferences or conclusions to be drawn from those facts. The moving party has the burden of showing entitlement to summary judgment. *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245, 249 (4th Cir. 1967). And "summary procedures should be used sparingly . . . where motive and intent play leading roles . . ."

*Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 490, 7 L.Ed.2d 458 (1962); *Denny v. Seaboard Lacquer, Inc.,* 487 F.2d 485, 491 (4th Cir. 1973).

## A. Undisputed Facts

Without attempting to be exhaustive, a review of the principal undisputed facts will be useful. The Maryland Bar examination is a bi-annual two-day test administered by the Board which is composed of three practicing attorneys, one of whom is black, appointed by the Maryland Court of Appeals. The board members are assisted in the preparation and grading of the essay portion of the examination by three assistant graders who are attorneys. Presently one assistant grader is black. Since July 1972 the Maryland Bar examination consisted of multiple choice questions given on one day and essay questions given on the second day. The multiple choice or Multi-State Bar Examination (MBE) questions are prepared and graded by the National Conference of Bar Examiners (NCBE) and are administered simultaneously in a majority of the states. The essay questions cover a variety of subjects and are prepared and graded by the Board members and their assistants. The subjects tested are prescribed by the Court of Appeals in Rule 7(d) Governing Admission to the Bar of Maryland. *See also* Maryland Board of Law Examiners Rules 1, 2(c). After both portions of the examination have been graded, the scores of the essay and MBE portions of the examination are combined into a final grade using the following formulae to determine if the examinee passes:

(i) a score of at least 70% on the Board's test and at least 50% on the MBE test; or

(ii) a combined score of at least 70%, giving the two scores equal weight after adjustment of the MBE score by Method 1 in the National Conference of Bar Examiners *Manual for the Interpretation and Use of Scores of the Multi-State Bar Examination.*[2]

Maryland Board of Law Examiners Rule 2(e)(1). *See* Rule 7(e) Governing Admission to the Bar of Maryland. Thereafter the Board meets to establish a review range; essay papers falling within that review range with otherwise failing scores are then reevaluated. As a result of this reconsideration, failing scores can be and have been raised to passing grades. Dorsey Deposition at 33–34, 80–82; Defendants' Answers to Plaintiffs' Interrogatories, ¶¶ 35, 69; *see Tyler v. Vickery,* 517 F.2d 1089, 1092 (5th Cir. 1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976). The review procedure, already described, is markedly similar to the procedure in *Singleton v. Louisiana State Bar Ass'n,* 413 F.Supp. 1092 (E.D.La.1976), wherein Judge Wisdom, writing for a three-judge court, observed:

> [T]he guidelines prescribed by the . . . examiners who prepare the questions maximize the chances for uniform standards of grading. Furthermore, failing applicants as to any given question are guaranteed review by the . . . examiner who prepared the question. Finally, the review provided by the [examiners] as a whole further protects applicants from unduly harsh judgments of individual graders.

In sum, there is neither the possibility that the opinion of a single . . . examiner, through the use of his guidelines or model answers, shall determine an applicant's failing grade on a particu-

---

**2.** By Maryland Board of Law Examiners Rule 2(e)(2) "the Board may, in the interest of justice, lower (but not raise) any or all of the foregoing requirements at any time before notice of the results."

lar question, nor the possibility that the opinion of *any* single individual shall determine an applicant's failing grade on any question. The criteria provided for grading the examinations are neither irrational nor arbitrary, and the application of such criteria by numerous different graders is a legitimate and effective means of grading the examinations.

413 F.Supp. at 1098 (emphasis original). The Board's procedures are equally valid. As noted earlier, an unsuccessful applicant may compare his responses to model answers and may seek review of his examination by the Maryland Court of Appeals.

Although it does not appear that the thrust of plaintiffs' attack is against the Multi-State Bar Examination, it will be considered since it plays a substantial part in the overall examination administered by the Board. As stated, the MBE is developed by NCBE and tests candidates in a variety of subjects. *See* Maryland Board of Law Examiners Rule 2(d). The Board does not change any of the MBE questions but reviews each MBE in advance to determine whether to use the test. Gingerich Deposition at 6–8. The Board administers the MBE in accordance with procedures established by NCBE. Pullen Affidavit, ¶ 5; MBE Supervisor's Manual (1975). The NCBE through the Educational Testing Service has sole responsibility for grading the MBE, which is done by scoring of answer sheets that are identifiable only by number and not by the name of the examinee. Pullen Affidavit, ¶ 5. Although the Board determines what will constitute a passing score on the MBE and administers the MBE to examinees, it plays no role in the MBE's preparation or grading.

The Board members and their assistant graders develop the essay questions. Each person involved covers certain subject areas and is responsible for preparing an equal portion of the test. Gingerich Deposition at 20. Questions are derived from the experience of the Board members and their assistants, from prior examinations, and from suggestions from judges, law school professors and materials furnished by NCBE. *Id.* at 21–22; Dorsey Deposition at 44–45. Additionally the Board members and their assistants prepare model answers to the questions to guide later grading of the examination. Defendants' Answers to Interrogatories, ¶ 17. After the questions and model answers have been prepared, the Board members meet with their assistants and the questions and model answers are reviewed, revised, discarded, amended, pruned and generally subjected to critical evaluation. Out of this review, a final set of questions develop. The court has reviewed copies of essay questions used in the Maryland Bar examination for the years 1970 to 1975 which are exhibits to defendants' motion for summary judgment.

The actual administration of the examination falls principally on the Board's administrative staff and on proctors hired for the occasion. Board members are at the examination site to answer any questions and, on occasion, have assisted in distributing examination materials. Dorsey Deposition at 76–77; Defendants' Answers to Interrogatories, ¶ 67(a).

The grading procedures for the essay portion of the Bar examination are designed to insure anonymity. The examination books do not contain the names of the candidates, but rather are identified through seat numbers. The documents correlating the seat numbers with the candidates' names are in the exclusive control of the administrative staff and are not available to the Board or the assistants.[3] Pullen Affidavit, ¶ 2; Statement Concerning Administrative Procedures to Preserve Anonymity of Candidates on the Bar Examination. The grading process is succinctly stated in part of Defendants' Answers to Plaintiffs' Interrogatories, ¶ 12:

---

**3.** Neither the Board and its assistants nor the administrative staff has any systematic data on the race of the candidates taking the Bar examination. The application to take the examination does not require specification of race and no photograph is required. Defendants' Answers to Interrogatories, ¶¶ 39, 40.

The answer to each question is graded by the person (Board member or Assistant) who prepared that particular question. Prior to beginning the grading process, each person establishes a method of scoring for recognition of issues, discussion and reasoning within the dictates of Court of Appeals Rule 7c. Each person then grades approximately 25 books containing the answers to their questions. Thereafter each person may make an adjustment in the method of scoring to give the candidates the benefit of the issues more easily recognized than those which may appear to be more obscure to the candidates. He then rereads the books and scores on the new basis. Even if adjustment is not made, the first 25 books are reread. Each Board member reviews the method of scoring used by one Assistant in grading the answers after the Assistant has graded approximately 25 books. At present this review includes an examination by the Board member of the books themselves graded by the Assistant. Thereafter adjustment may be made in the scoring. If adjustment is made, the Assistant rereads the books and grades upon the new basis. After all books in a given subject have been thus read and graded, the person grading the books may upgrade all scores if he feels that would be appropriate.

Thereafter, with the MBE scores available, the Board members reconsider those papers falling within a review range and upgrade certain of those papers to passing scores. Facts omitted from this summary will be included in the discussion which follows where they are pertinent.

## B. Discrimination

■ As a point of beginning, it is worth stating that the State has a legitimate interest in regulating admission to the Bar through imposing licensing standards to insure professional competence. As the Court stated in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957):

> A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. . . . Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory. (citations omitted).

*See also In re Griffiths*, 413 U.S. 717, 722–23, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Martin-Trigona v. Underwood*, 529 F.2d 33, 35 (7th Cir. 1975) (per curiam); *Hawkins v. Moss*, 503 F.2d 1171, 1175–76 & n.5 (4th Cir. 1974), *cert. denied*, 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 400 (1975).

■ Plaintiffs do question whether a rational relationship exists between the Maryland Bar examination and competency to practice law. Specifically, plaintiffs allege that the Bar examination is not scientifically designed by experts in testing, that it tests only legal memorandum skills, memory and ability to cram, that it is not graded on an absolute scale of professional competence and that the examination is inherently discriminatory or culturally biased against blacks as evidenced by the disproportionately high black failure rate.[4]

---

**4.** Plaintiffs allege that between 1962 and 1972 approximately fifty percent of the examination papers submitted by whites received a passing grade; for the comparable period, the black passing rate was six percent. Beginning with the winter 1973 examination on ten out of the previous eleven examinations, plaintiffs allege that approximately fifty percent of the examination papers submitted by whites received a passing grade whereas the comparable figure for blacks was twelve percent. Finally, plaintiffs contend that since 1962 and apparently through the winter 1973 examination, seventy percent of the whites taking the Bar examination eventually succeeded in passing while only twenty percent of the blacks eventually passed the examination. Plaintiffs' Amended Complaint, ¶¶ 9–11. These figures were derived through informal monitoring of Bar examinations by black candidates. Defendants, claiming to lack any systematic data on the race of the Bar applicants, have not supplied any comprehensive information on possible racial disparities between success rates on the Bar ex-

Plaintiffs also allege that the Board has intentionally discriminated against black applicants. The Board is alleged to have the opportunity to ascertain the race of Bar applicants through the possible availability of the master lists matching candidates' names with seat numbers, the possibility that the attorneys conducting the in-person character interviews relate racial information about candidates to the Board, the alleged availability of law school records, and the alleged ability of the Board to identify a distinctive black writing style. Finally, plaintiffs assert that the Board has the arbitrary right to review those papers near the passing level and may in this process further perpetrate racial discrimination.

### 1. *Intentional Discrimination*

Plaintiffs' claims of intentional racial discrimination by the Board find no support in the undisputed facts. None of the affidavits submitted by plaintiffs in response to defendants' motion for summary judgment reveal any specific instances of racial discrimination. Plaintiffs appear to rely primarily on the differing passing rates for blacks and whites to support an inference of intentional discrimination.[5] Even if these purported statistical disparities and the incidents outlined in footnote 5 were to suggest the possibility of racial discrimination, the record shows without dispute that the Board neither discriminated nor had any opportunity to discriminate.

The alleged opportunities for discrimination have been canvassed previously. With respect to the availability of the master lists containing the names of the examinees and their seat numbers, the affidavit of Pullen, Clerk to the Board, and the affidavits of the Board members conclusively demonstrate that these master lists are never available to the Board. Moreover, the lists do not identify the race of the examinees.

The supposed possibility that racial information could filter through to the Board from the attorney conducting the character interview of the examinee is conclusively disposed of by the deposition of Board Chairman Gengerich. Board members only become involved in the character review process where there has been an adverse recommendation. Gingerich could recall no character review hearing held by the Board involving a black. Even if the Board were to have received racially identifying information about black applicants in the character review process (and the uncontroverted evidence is that they did not) the Board still did not possess the capacity to match candidate names with their seat numbers. Without this correlation, the Board lacked the opportunity to discriminate. The same conclusion applies to any Board access to law school or preceptor records; moreover, such records would not necessarily disclose a candidate's race. Likewise, when the Board members review papers in the review range they do not possess either a candi-

amination. They do, however, question the consistency of plaintiffs' statistics.

Plaintiffs suggest that the dispute over the passing statistics should defeat summary judgment. For the reasons to be discussed concerning the opportunity to discriminate, these differences do not pertain to genuine issues of material fact.

5. *See* note 4 *supra*. In the affidavit of Charles B. Marshall two incidents are recounted apparently for their possible inference of discrimination. After the February 1971 Bar examination a group of blacks who had failed the test met with the Board to discuss their grievances. Subsequently all the unsuccessful black candidates who had attended the meeting, except affiant Marshall, passed the July 1971 Bar examination. Marshall suggests that his failure stems from his earlier, more intimate contact

with the Board. Marshall also asserts that after the February 1971 examination he met with a former Board member to review his deficient examination. According to Marshall all of his examination books were marked with a small "c". Upon inquiry the Board member said the letter represented an administrative code. Apparently plaintiffs wish this court to construe the marking as meaning colored. David Allen's affidavit relates the proctors' practice during the Bar examination of inquiring of all candidates their name and seat number to check attendance. This procedure, plaintiffs suggest, could effectively be used to discriminate. There is nothing in the record to suggest, however, that the checking process has been used to gather racial information or that even if the process were so used, that the Board had access to the data.

date's name or any racial information and the review procedure does not present a feasible opportunity for discrimination.

Lastly, plaintiffs argue that a black writing style could be gleaned by the Board and it assistants in grading examination papers. This allegation of a discernible black writing style is wholly unsupported by the plaintiffs. In their interrogatory responses, plaintiffs admit that they would not be able to discern a black writing style in Bar examination answers, but for unexplicated reasons, they asserted that the Board had such an ability. Plaintiffs' General Answers to Defendants' Interrogatories, ¶ 35(b), (e). Each Board member has specifically denied any ability to identify the race of a Bar examination candidate on the basis of handwriting or writing style. Gingerich Affidavit, ¶ 9; Dorsey Affidavit, ¶ 8; Thompson Affidavit, ¶ 8. The court accepts these uncontroverted statements as true. See *Tyler v. Vickery*, 517 F.2d at 1093–95.

In *Tyler v. Vickery*, 517 F.2d at 1093, the court upheld the district court's grant of summary judgment in a case, very similar to the one at bar, involving a challenge to the Georgia Bar examination based on racial discrimination. The *Tyler* court stated:

> However, discriminatory motivation, even if proved, is not in itself a constitutional violation, *Palmer v. Thompson*, 1971, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438, and becomes so only when given the opportunity to manifest itself in discriminatory conduct.

That opportunity is not present in the conduct of the Maryland Bar examination.

The materials filed in this case concerning the summary judgment motion reveal that the Board has no opportunity to discriminate in either the preparation, administration or grading of the Maryland Bar examination. As the affidavits of the Board members relate, race of examinees is not known by the Board members.[6] The stringent procedures adopted by the Board, related in the affidavit of Pullen and the exhibits filed therewith, conclusively insure the anonymity of Bar examination candidates and concomitantly, the impossibility of discrimination. There is no genuine issue as to a material fact and the defendants are entitled to summary judgment on the issue of intentional discrimination. *Tyler v. Vickery, supra; Singleton v. Louisiana State Bar Ass'n, supra; Harris v. Louisiana State Supreme Court*, 334 F.Supp. 1289, 1304–07 (E.D.La.1971). Cf. *Feldman v. State Bd. of Law Examiners*, 438 F.2d 699, 703–04 (8th Cir. 1971).

### 2. Inherent Discrimination

Plaintiffs also contend that a genuine issue of material fact exists with respect to whether the Bar examination, absent any scientific validation, accurately measures an applicant's fitness to practice law. It is well settled that the appropriate standard of review is whether the Maryland Bar examination bears a rational relationship to the state's admittedly valid interests in professional licensure. *Schware v. Board of Bar Examiners*, 353 U.S. at 239, 77 S.Ct. 752; *Tyler v. Vickery*, 517 F.2d at 1099–1101; *Whitfield v. Illinois Bd. of Law Examiners*, 504 F.2d 474, 476 n.5 (7th Cir. 1974) (per curiam); *Feldman v. State Bd. of Law Examiners*, 438 F.2d 699, 705 (8th Cir. 1971); *Chaney v. State Bar of California*, 386 F.2d 962, 964–65 (9th Cir. 1967), cert.

---

**6.** The affidavits disclose that "in extremely isolated circumstances" candidates, contrary to instructions, write their names on examination books. Gingerich Affidavit, ¶ 6; Dorsey Affidavit, ¶ 5; Thompson Affidavit, ¶ 5. Even with this knowledge of a candidate's name and seat number, the Board would not know anything about the candidate's race. The only instance in which a member of the present Board has known the race, name, and seat number of a candidate occurred when a candidate approached a member of the Board during the examination and without prompting volunteered his name and seat number. The examinee, who failed the examination, was white. Thompson Affidavit, ¶ 3. Since the winter 1972 examination, the Board has had a practice generally to remain outside the examination room a procedure which would prevent any opportunity for any test site identification of candidates' seat numbers and race. Gingerich Affidavit, ¶ 7; Dorsey Affidavit, ¶ 6; Thompson Affidavit, ¶ 6.

*denied*, 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162, *reh. denied*, 391 U.S. 929, 88 S.Ct. 1803, 20 L.Ed.2d 670 (1968); *Lewis v. Hartsock*, No. 73–16 at 15–16 (S.D.Ohio, Mar. 9, 1976); *Shenfield v. Prather*, 387 F.Supp. 676, 686 (N.D.Miss.1974). That plaintiffs allege disparate racial impact stemming from the Bar examination does not suffice to evidence a suspect racial classification and thereby trigger a strict scrutiny analysis. *Hunter v. Erickson*, 393 U.S. 385, 391–93, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). As the Court recently stated in *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976): [7]

> We have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, *McLaughlin v. Florida*, 379 U.S. 184 [85 S.Ct. 283, 13 L.Ed.2d 222] (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

In contesting the validity of the Maryland Bar examination, plaintiffs do not question the use of essay questions.[8] Plaintiffs appear to rely principally upon the affidavit of Dr. Richard Barrett, Director of the Laboratory of Psychological Studies and Professor of Management Science and Director of the Division of Applied Psychology at Stevens Institute of Technology. The substance, however, of Dr. Barrett's affidavit is that the Maryland Bar examination as presently designed, administered and graded does not comport with the standards for educational and psychological tests as published by the American Psychological Association. Barrett Affidavit, Exhibit A. As the Court stated in *Washington v. Davis*, an employment test attacked on equal protection grounds need only be rationally job related. 426 U.S. at 248–52, 96 S.Ct. 2040; *Richardson v. McFadden*, 540 F.2d at 748–49. The standards of the American Psychological Association are not those used in applying the "rational relationship" equal protection test. Dr. Barrett's criticisms are at best indications of how the Bar examination could be improved and are not suggestions of constitutional infirmity. *See Tyler v. Vickery*, 517 F.2d 1089, 1102 (5th Cir. 1975), *cert. denied*, 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976).

In their response to defendants' motion for summary judgment, plaintiffs particularly question the validity of the Board's cutoff passing scores. Maryland, as many other states, requires a seventy percent score for passing. *See* Maryland Board of Law Examiners Rule 2(e)(1). The seventy percent requirement has been upheld as being rationally related to the determination of minimum professional competency. *Richardson v. McFadden*, 540 F.2d at 749–50; *Tyler v. Vickery*, 517 F.2d at 1102; *Shenfield v. Prather*, 387 F.Supp. 676, 689 (N.D.Miss.1974). As the court stated in *Shenfield*:

> Once it is agreed that some minimum standard is permissible, the question becomes one of degree. . . . The 70% passing requirement, which has been adopted by 16 of the 24 states whose practice is known to us, is a reasonable yardstick by which competence . . . may be determined.

In their complaint plaintiffs also alleged that the Bar examination tests only legal memorandum skills, memory and cramming ability. Yet as the court stated in *Lewis v.*

---

**7.** In *Washington* the Court expressly rejected the contention that Title VII standards apply in resolving a Fourteenth Amendment equal protection claim.

**8.** The use of such questions on Bar examinations has been repeatedly upheld. *See, e. g., Tyler v. Vickery*, 517 F.2d at 1102; *Feldman v.*

*State Bd. of Law Examiners*, 438 F.2d 699, 705 (8th Cir. 1971); *Chaney v. State Bar of California*, 386 F.2d 962, 964–65 (9th Cir. 1967), *cert. denied*, 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162 *reh. denied*, 391 U.S. 929, 88 S.Ct. 1803, 20 L.Ed.2d 670 (1968).

*Hartsock*, No. 73–16 (S.D.Ohio, Mar. 9, 1976):

> The state has a substantial interest in assuring that persons licensed to practice law meet minimum standards of professional competence. The bar examination provides such a guarantee. Lawyers must be versed in the major areas of the law. They must be trained in legal craftsmanship and capable of understanding legal writing, because knowledge of the law is communicated primarily through writing. The law itself is codified in statutes and construed in written decisions. The constitution the Court applies today is a written document. The lawyer must be able to analyze facts to determine their legal significance. And perhaps most importantly, the lawyer must be able to communicate the relevant facts and the applicable law in writing. If he cannot do so, he will not be able to draft wills, contracts and other legal instruments for his clients, and he will not be able to adequately defend his client's interests in litigation.

Slip op. at 16–17. *See Feldman v. State Bd. of Law Examiners*, 438 F.2d 699, 705 (8th Cir. 1971); *Chaney v. State Bar of California*, 386 F.2d 962, 964–65 (9th Cir. 1967), *cert. denied*, 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162, *reh. denied*, 391 U.S. 929, 88 S.Ct. 1803, 20 L.Ed.2d 670 (1968); *Shenfield v. Prather*, 387 F.Supp. at 682, 689.

The court believes no genuine issue of any material fact exists as to whether the Bar examination is rationally related to the state's strong interests in the professional competence of its attorneys. The essay portion of the examination and the MBE test a broad spectrum of basic legal principles. The examination requires rapid legal analysis of fact situations and the ability to convey that analysis in reasoned written form. These attributes are the hallmark of the legal profession. The defendants are entitled to summary judgment on this issue.

### Conclusion

For the reasons stated in this opinion, the court concludes:

a) that Pettit and Bettis must be dismissed as plaintiffs

b) that the remaining plaintiffs shall represent a class consisting of all blacks who have taken the Maryland Bar examination and failed.

c) that no genuine dispute exists as to any material fact and the defendants are entitled to summary judgment as a matter of law.

The court further concludes that an award of attorneys' fees is inappropriate. *See Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 269–71, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *cf.* Act of October 19, 1976, Pub.L. No. 94–559 (to be codified at 42 U.S.C. § 1988).

Judgment will be entered separately.