Carlos DELGADO, et al., Plaintiffs,

v.

Desmond McTIGHE, et al., Defendants.

Civ. A. No. 76–1206.

United States District Court,
E. D. Pennsylvania.

Aug. 10, 1981.

Alan M. Lerner, Jeffrey Pasek, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for plaintiffs.

James D. Crawford, Deena Jo Schneider, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

### Introduction

The plaintiffs in this action are three Blacks and two Hispanics who failed the Pennsylvania bar examination at least once between February 1973 and July 1976. They allege that they would have received a passing grade on at least one of the bar examinations during this period if the defendants, the Commonwealth of Pennsylvania State Board of Law Examiners and its members (Board), had not on several occasions between 1973 and 1976 raised the minimum passing grade for the bar examination above its July 1972 level. The plaintiffs contend that their rights under the equal protection clause of the fourteenth amendment were violated in that: 1) the changes in the passing grades were done arbitrarily and with intent to discriminate against minority applicants; and 2) the bar examination is not rationally related to the objectives of the examination. The plaintiffs seek redress for these alleged violations under 42 U.S.C.A. §§ 1981 and 1983.

The allegation that Blacks have been excluded by the Board from the practice of law in Pennsylvania is not new. Frankly, some of the statistics are shocking. For the ten year period from 1933 to 1943, no Black

was admitted to the practice of law in Pennsylvania. In 1953, the then Chancellor of the Philadelphia Bar Association, Bernard G. Segal, appointed a Special Committee to investigate the allegation of discrimination in the grading of bar examinations. This Special Committee, which became known as the "Hastie Committee",[1] reported in 1954 that from July 1950 to the end of 1952, thirty Black candidates from Philadelphia County took a total of forty-three examinations, some individuals being examined two or more times, and that only six of them passed. In 1970, the then Chancellor of the Philadelphia Bar Association, Robert M. Landis, appointed a Special Committee, which became known as the "Liacouras Committee",[2] to "investigate the claims of possible discrimination against black law students." The Liacouras Committee Report[3] pointed out that Black enrollment in predominantly white law schools, which for many years had been less than 1%, showed a significant increase between 1966 and 1970 as the result of affirmative action taken to overcome the historic exclusion of Blacks. In 1971, the Board was threatened with litigation by a group represented by Paul Bender, a professor at the University of Pennsylvania Law School. However, this instant litigation, instituted in 1976, appears to be the first time that allegations of discrimination by the Board have been subjected to judicial scrutiny.

The Court held a class certification hearing on June 22–24, 1981, and denied the plaintiffs' motion for class certification in a Memorandum and Order dated July 2, 1981. This action was tried by the Court, sitting without a jury, from July 13, 1981 to July 28, 1981. For the reasons hereinafter set forth, the Court concludes that the plaintiffs have failed to carry their burden of proof with respect to each of the two constitutional violations claimed by them.

*Background*

In addition to the testimony of the plaintiffs, the Court received testimony from four members of the Board (Desmond McTighe, Esq., Judge Justin Johnson, Judge Abraham Lipez and Judge (now Justice) Roy Wilkinson), Dean Liacouras of Temple University Law School, Professor Paul Bender of the University of Pennsylvania Law School, and such experts as Dr. James Portwood, Dr. Richard Barrett and Mr. Earl Medlinsky. On the basis of this evidence, the Court makes the following findings of fact.

Rule 203(4) of the Pennsylvania Bar Admission Rules sets forth as a requirement for admission to the bar "satisfactory completion of a bar examination administered by or under the authority of the [Board]." The Board is composed of five members of the Pennsylvania bar appointed by the Supreme Court of Pennsylvania. The members of the Board generally sit for five year terms. During the years in question in this lawsuit, 1972–76, the following distinguished lawyers and judges were members of the Board:

Marvin Comisky
    February 23, 1973 to May 15, 1975
Robert Dechert
    November 21, 1933 to June 12, 1939
    May 15, 1970 to February 23, 1973
John W. English, Sr.
    May 20, 1974 to the present
The Honorable Justin M. Johnson
    April 1, 1969 to the present

---

1. This Committee consisted of Abraham L. Freedman, who at the time of his demise was a Judge of the United States Court of Appeals for the Third Circuit, G. Ruhland Rebmann, Jr., Esq., Theodore G. Spaulding, who at the time of his demise was a Judge of the Superior Court of Pennsylvania, and William G. Hastie, who at the time of his demise was a Judge of the United States Court of Appeals for the Third Circuit.

2. This Committee was composed of Peter G. Liacouras, presently Dean of the Temple University Law School, Paul A. Dandridge, presently a Judge of the Common Pleas Court of Philadelphia County, Clifford Scott Green, presently a Judge of the United States District Court for the Eastern District of Pennsylvania, Ricardo C. Jackson, presently a Judge of the Philadelphia Municipal Court, and W. Bourne Ruthrauff, Esq.

3. 44 Temple Law Quarterly, No. 2 (1971).

Vice-Chairman from April 9, 1976 to the present

The Honorable Abraham H. Lipez
January 16, 1961 to January 14, 1976
Vice-Chairman from March 12, 1970 to January 14, 1976

Desmond J. McTighe
October 9, 1964 to the present
Chairman from November 3, 1973 to the present

Anthony S. Minisi
May 15, 1975 to the present

The Honorable Roy Wilkinson, Jr.
January 5, 1959 to May 20, 1974
Vice-Chairman from May 1, 1961 to March 12, 1970
Chairman from March 12, 1970 to November 3, 1973

During the period in question in this lawsuit, the Board employed eight examiners who were responsible for the initial preparation of the bar essay questions as well as sample answers to those questions. Each examiner graded the essay examination question which he prepared. The Board also employed a Supervising Examiner who reviewed and revised the examiners' questions and sample answers and supervised the grading of the essay examination papers by the examiners. The Supervising Examiner during the period relevant to this lawsuit was William C. Storb, who first became an examiner in 1945.

Prior to 1972, the Pennsylvania bar examination, which is given in February and July of each year, was a two-day essay test consisting first of 24 and, more recently, 16 questions on various subjects with which the Board believed individuals seeking to practice law should be familiar. In the late 1960's the National Conference of Bar Examiners (NCBE) began serious efforts to develop a multiple choice test to be administered as part of the bar examination on a national basis. This examination evolved into what is today known as the Multistate Bar Examination (MBE). Justice Wilkinson, who was then Chairman of the Board, was a member of the NCBE multistate examination policy committee responsible for the development of the MBE. Pennsylvania played a leading role in the development of the MBE.

The MBE was first administered in February 1972, and Pennsylvania was one of six states that initially determined to include the MBE as part of its February 1972 bar examination. Since February 1972, the Pennsylvania bar examination has consisted of one day of eight essay questions and one day of the MBE, which consists of 200 multiple choice questions.

*The Essay Part of the Bar Examination*

Beginning in 1972, the essay part of the Pennsylvania bar examination was limited to the five subjects covered by the MBE (contracts, criminal law, evidence, real property and torts) plus a constitutional law and a negotiable instruments question. In July 1976 one torts question and the negotiable instruments question were omitted from the essay examination and questions in corporations and decedents' estates were added to the subjects covered by the essay examination. The Board viewed all of these subjects as basic legal subjects with which every applicant to the bar should be familiar.

Then, as now, each essay question on the Pennsylvania bar examination presented a fact situation and requested the applicant to discuss the issues presented and the applicable legal principles. Several months before each examination, an examiner prepares a proposed question in his area of expertise which he then circulates to the other examiners and to the Supervising Examiner for approval. After his question is approved, the examiner prepares a sample answer to the question which is circulated among the other examiners. Approximately two months before the examination, the entire examining staff meets to discuss and to refine all of the proposed questions and answers. After this meeting, which generally takes two days, the corrected questions and answers are then submitted to the Board for its approval. About a month before the examination, the Board meets with the examining staff and the questions are discussed. Each examiner is responsible

for grading the answers to the question which he prepared.

After the examination, an examiner reads a sample group of as many as 100 answers to his question in order to check the validity of his tentative grading basis. The entire examining staff then meets with the Board to review the results of the grading of the sample papers and the tentative grading basis that each examiner has prepared.

Prior to 1971 or 1972, each member of the Board was assigned to act as a liaison between the Board and one or more of the Pennsylvania law schools. Following each bar examination, each Board member would meet with the dean and faculty of the respective law school to which he was assigned to review the essay questions and sample answers and to learn the professors' reactions to them. In 1971 or 1972, the Board began to invite the deans of the Pennsylvania law schools or their chosen representatives to attend the post-examination meetings between the Board and the examiners at which the examiners' tentative grading basis is reviewed.

Whenever it appears at the post-examination meeting that a significant number of applicants might not have seen or discussed a particular issue, the number of points tentatively assigned to that issue is decreased and the remaining points are redistributed over other issues. The law school representatives' views as to the appropriateness of the sample answers prepared by the examiners and the likelihood that their students would see or discuss the points contained in the answers is taken into account during the grading process. After the post-examination meeting, each examiner revises his sample answer to reflect the changes suggested at the meeting. After the test is graded the Board makes available the essay questions and their sample answers.

Grammar, spelling, punctuation and writing ability have never been required in order for an examinee to receive full credit for an answer to an essay question. Until sometime in the mid-1970's essay examination papers receiving scores between 65 and 70 were re-read by members of the examining staff and/or the Board to determine whether the papers should be recommended for passing. The majority of papers that were re-read were eventually recommended for passing.

## The MBE Portion of the Bar Examination

The Board has no direct responsibility for the preparation or grading of the multiple choice questions used in the MBE, although some of the members of the Board and some of the examiners have been involved in the development of questions in particular subject areas and the Board has reviewed each MBE prior to its administration as part of the Pennsylvania bar examination. The NCBE has primary responsibility for the creation of each MBE and has retained the Educational Testing Service (ETS) to provide technical assistance.

Prior to the first administration of the MBE, the NCBE multistate examination policy committee determined that the examination should include questions in five basic areas of the law (contracts, criminal law, evidence, real property, and torts). In 1975 or 1976 the NCBE multistate examination policy committee determined that constitutional law should also be included as a subject tested by the MBE. The NCBE has established test development committees consisting of bar examiners, law school professors, and practicing lawyers with expertise in each subject area tested by the MBE. These committees have primary responsibility for the drafting of questions within their field of expertise.

The MBE consists of a series of fact situations followed by four possible answers, one of which is designed to be clearly better than any of the other three. Some MBE questions do not ask the examinee to choose the correct answer but rather the best answer under the circumstances. The MBE thus attempts to test the examinee's advocacy as well as his knowledge of the law and his understanding of the applicability of legal principles to particular fact situations.

The MBE is designed to give maximum information about the relative skills of the applicants in order to aid state boards in determining who in their view has demonstrated minimum competence to practice law in their jurisdiction. Of the 200 questions on each MBE, 160 are new and 40 are carried over from a previous examination in order to enable scores on different examinations to be scaled to reflect relative difficulty of the examinations. Questions are carried over from one examination to another only once. The MBE questions go through an elaborate testing process in order to determine their clarity, fairness and the correctness of the proposed answers. This process involves technical testing by ETS as well as review of each individual question by experts in the subject areas covered.

Before the administration of each MBE, each state board of law examiners planning to use the test as part of its bar examination is invited to review the test to determine whether it is appropriate for use in that state. The Board has taken advantage of this offer for pre-administration review of the MBE.

*The Determination of the Passing Grade*

Prior to 1972, the Pennsylvania bar examination was an all-essay test and the passing grade on the examination was 70 out of a possible 100. The score of 70 was initially established on the basis of conventional grading procedures and was one with which the Board felt comfortable as it reviewed performance on the examination. Because of its past practice of reading a group of selected essay examination papers of varying quality, the Board was aware of the types of examination papers that were being submitted by applicants to the Pennsylvania bar and believed that 70 was an appropriate passing mark on the examination. The Board's involvement in the essay examination re-reading process gave it further reason to believe that 70 was an appropriate passing grade.

In setting the passing grade on the Pennsylvania bar examination, the Board has always been concerned exclusively with determining what grade in its view demonstrated minimum competence to practice law. Sometime around 1970 the Board became concerned that applicants who might otherwise be competent to practice law were not being admitted to the bar because they failed to perform adequately on the essay examination. The desire to offer such applicants an opportunity to demonstrate their competence to practice via other means was part of the impetus which led to the Board's inclusion of the MBE as part of the February 1972 bar examination.

Neither the developers of the MBE nor anyone else was certain in the beginning how applicants would perform on this test or how the grades on the MBE would relate to or should be combined with those on the essay portion. Due to this initial uncertainty concerning what should constitute a passing score on the MBE and the Board's feeling that it would be better to err on the side of admitting unqualified applicants rather than excluding qualified applicants, the Board determined to set a low passing grade on the February 1972 bar examination and then to increase the passing grade for later examinations on the basis of their review of the results. Pennsylvania's passing grade upon introduction of the MBE was one of the lowest among the states that adopted the MBE as part of its bar examination and the Board intended to raise the passing grades following the February 1972 bar examination if it determined that the grade was too low.

Judge Wilkinson, then Chairman of the Board, believed that the appropriate passing grade for a combined essay-MBE examination should be somewhere between 60 and 70 and that this was where the Board would eventually establish its passing grade. While Judge Wilkinson urged NCBE and ETS to advise him as to what passing grade would be appropriate for use in the February 1972 essay-MBE bar examination, neither organization was willing to recommend a passing score.

*The Bar Examinations from 1972–1976*

After consulting with numerous interested parties and extensive discussion among themselves, the Board set the passing grade for the February 1972 examination at a score of 85 on the MBE. Of the 211 applicants who took the February 1972 examination, 208 (99%) passed. The Board knew that traditionally the February bar examination was taken by a greater percentage of applicants who had previously failed the examination than is the case with the July bar examination, and that the percentage of applicants passing the February examination was generally somewhat lower than the percentage passing the July examination. In the years immediately before the introduction of the MBE, the percentage of applicants passing the July bar examination was somewhere in the 80's. Based on these experiences and a review of the essay scores achieved by some applicants who had passed the February 1972 bar examination, the Board determined to raise the passing grade on future examinations because there was a consensus that a score of 85 on the MBE alone did not demonstrate sufficient competence to practice law.

Beginning in July 1972 the Board began to set the passing grade on the bar examination by a series of combinations of scores on the essay and the MBE portions of the examination. The combinations of scores varied slightly from one examination to the next as the Board strived to find what it considered the appropriate combinations, achievement of any one of which would demonstrate sufficient competence to practice law. For the July 1972 examination, the Board determined that an applicant would pass if he obtained a score of 130 on the MBE alone, a combination of 100 on the MBE and 50 on the essay, or a combination of 85 on the MBE and 65 on the essay. Of the 1141 people who took the Pennsylvania bar examination in July 1972, 1113 (98%) passed.

For the February 1973 examination, the Board determined that an applicant would pass if he obtained a score of 130 on the MBE alone, a combination of scores of 105 on the MBE and 50 on the essay, or a combination of scores of 85 on the MBE and 65 on the essay. Of the 268 people who took the examination in February 1973, 224 (84%) passed.

For the July 1973 examination, the Board determined that an applicant would pass if he obtained a score of 125 on the MBE alone, a score of 70 on the essay alone, a combination of scores of 102 on the MBE and 50 on the essay, or a combination of scores of 85 on the MBE and 65 on the essay. Of the 1490 people who took the Pennsylvania bar examination in July 1973, 1419 (95%) passed.

Beginning with the February 1974 bar examination and continuing thereafter, "scaled" MBE scores representing the relative performance of an applicant taking one MBE examination vis-a-vis other applicants taking other MBE examinations were made available and were used by the Board in determining whether a particular applicant passed. For the February 1974 examination, the Board determined that an applicant would pass if he obtained a score of 130 on the MBE alone, a score of 70 on the essay alone, a combination of scores of 105 on the MBE and 50 on the essay, or a combination of scores of 85 on the MBE and 65 on the essay. Of the 365 people who took the Pennsylvania bar examination in February 1974, 314 (86%) passed.

During these years in which the MBE was included as part of the Pennsylvania bar examination and the Board was experimenting with the passing grade, various members of the Board became increasingly concerned that some applicants were passing the examination with scores of 50 or lower on the essay part of the examination. These scores, in the Board's view, did not demonstrate sufficient competence to practice law. The Board was also aware that its passing percentage was much higher than it had been prior to the introduction of the MBE and significantly higher than that of other states. The Board became concerned that if other states were setting significantly higher requirements for admission to the bar than Pennsylvania, Penn-

sylvania's standard might not be sufficient to demonstrate an applicant's competence to practice law.

In July 1974 the Board adopted a method of combining the MBE and essay scores recommended by ETS and NCBE known as the "equi-percentile method." Under this method the scores achieved on the MBE and the essay portions of the examination were placed in percentiles and the original MBE score for any given percentile was translated to the essay score occupying the same percentile; the resulting MBE scores were then averaged with the essay scores to create a so-called "combined" score. For the July 1974 examination, the Board determined that an applicant would pass if he obtained a score of 135 on the MBE alone or a combined score of 55. Of the 1746 people who took the Pennsylvania bar examination in July 1974, 1639 (94%) passed.

Following the July 1974 examination the Board had some question as to the appropriateness of its passing grade of a combined score of 55. Accordingly, it determined that for the February 1975 examination an applicant would pass if he obtained a combined score of 60. No MBE cut-off score was set because the Board determined to have all of the essay examination papers read. Of the 370 people who sat for the Pennsylvania bar examination in February 1975, 244 (66%) passed.

The Board has never raised the combined score passing grade of 60 since February 1975 and believes that achievement of this grade does reflect sufficient competence to practice law. For the July 1975 examination, the Board determined that an applicant would pass if he obtained a score of 135 on the MBE alone as well as if he obtained a combined score of 60. Of the 1649 people who sat for the Pennsylvania bar examination in July 1975, 1389 (84%) passed.

The Board again decided to have all of the essay examination papers read for the February 1976 examination and therefore determined that an applicant would pass only if he obtained a combined score of 60. Of the 555 people who sat for the Pennsyl-

vania bar examination in February 1976, 370 (67%) passed.

For the July 1976 examination, the last examination involved in this litigation, the Board again determined that an applicant would pass if he obtained a score of 135 on the MBE alone or a combined score of 60. Of the 1705 people who sat for the Pennsylvania bar examination in July 1976, 1528 (90%) passed.

### The Liacouras Committee Report

As previously stated, in 1970 the Philadelphia Bar Association appointed a committee of three attorneys and two judges to investigate claims of possible discrimination against black law students in bar admissions procedures. The report of that committee, which became known as the Liacouras Committee, stated that the average pass rate for the bar examinations administered between January 1955 and January 1970 was 67.6%, whereas the average pass rate for Blacks during that period was 27.7%. The report detailed the procedures by which the essay questions were devised, administered and graded, and concluded that there were many opportunities during the grading process for the bar examiners and Board members to obtain racial data regarding an applicant and discriminate against that applicant. The Report also raised "grave doubts" concerning the validity of the essay examination. An appendix to the report analyzed the bar examination under equal protection standards and concluded that the examination violated the equal protection clause because it had a disproportionate impact on Blacks.

Commencing in 1971, many changes were made in the bar examination procedures. Candidates were no longer required to state their race on their applications and were no longer required to provide a photograph of themselves. The Board hired black employees and a Black was appointed to the Board. Assigned seating at the examination was also eliminated. The Board not only eliminated all means by which race could be determined, but also adopted the MBE as part of its bar examination because of its

belief that Blacks might do better on the examination if they had confidence that their race could not be taken into account in the marking process. Thus since at least the beginning of 1972 no information whatsoever concerning a particular applicant's race has been available to the examiners who grade his paper or to the members of the Board who determine the passing grade on the examination.

### The Bernreuter Report

After the July 1972 bar examination, the Board retained Dr. Robert Bernreuter to perform an analysis of the July 1971, February 1972 and July 1972 bar examinations (Exhibits P20, 21 and 25). Dr. Bernreuter performed validity and reliability studies as to the MBE and essay portions of the bar examination, and concluded that both parts of the bar examination possessed sufficient validity and reliability. Dr. Bernreuter concluded:

> [T]his analysis of the Pennsylvania Bar Examination has disclosed that the traditional examination has been a valid device for admitting candidates to the Bar. The addition of multiple choice questions has made it an even better test, both in the practical aspect of shortening the time required for reporting the results, but also in the essential aspect of increasing the validity of the test. It is now both "fair" to the candidates, and serviceable in carrying out the desires of the Supreme Court of Pennsylvania for the selection of qualified members of the Pennsylvania Bar.

Exhibit P25, at 539.

Dr. Bernreuter also studied the performance of Blacks on these three examinations. Although the testimony at trial revealed a divergence of opinion as to his conclusions, his report states:

> As part of the affirmative action program of the State Board of Bar Examiners, care has been taken to eliminate all possible sources of racial discrimination among candidates. The giving and scoring of both the Essay and the MBE have been done under circumstances that pre-

clude the possibility of bias affecting the results. However, there does remain a difference in the performance of the black and white candidates on both the Essay and on the MBE. Through the cooperation of the black community it was possible to obtain a list of the names of the black candidates, so an analysis has been possible.

In July of 1972 there were 43 black candidates, of whom 34, or 79%, were admitted to the Bar. The lack of success of the 9 who failed was due more to failure on the Essay than on the MBE.

When the scores of the black candidates were compared with those of the whites, differences were found on both the Essay and the MBE. The average for the whites was higher on each test, and there were more high scores among the whites. On both the Essay and the MBE the poorest candidates as well the best were white candidates; thus the blacks were found to be a more homogenous group than the whites.

A further analysis showed a significant fact about the nature of the law schools attended by the blacks. Of 43 black candidates who took the test during July 1972, 12 had attended predominantly black law schools, and only 50% passed. The other 31 candidates had attended predominantly white law schools and 90% passed. A much larger percentage of those who attended white law schools were well prepared than of those who attended black law schools.

The fact that, as groups, the blacks and whites had different distributions of scores on both the Essay and the MBE makes the setting of the passing score a vital matter. If the distributions were the same the effect of setting a passing score would be to pass and to fail an equal proportion of each group. However, because of the differences in the distributions of scores, whatever passing score is selected will result in a difference in the proportions passed. This is shown by the table below.

## PASS–FAIL POINT AND BLACK WHITE FAILURES

| | MBE | | | ESSAY | |
| | % Failing | | | % Failing | |
| Score | Black | White | Score | Black | White |
|---|---|---|---|---|---|
| 170 | | 100 | 90 | | 100 |
| 160 | 100 | 95 | 80 | 100 | 88 |
| 150 | 91 | 76 | 70 | 82 | 45 |
| 140 | 80 | 44 | 60 | 36 | 17 |
| 130 | 56 | 19 | 50 | 9 | 5 |
| 120 | 39 | 7 | 40 | 0 | 1.5 |
| 110 | 24 | 2 | | | |
| 100 | 11 | .5 | | | |
| 90 | 3 | .2 | | | |
| 80 | 0 | .2 | | | |

. . . .

. . . No matter where the passing point is set, except at the very bottom, more blacks than whites will be failed.

The remedy for this situation is beyond the scope of the present inquiry. It seems clear, however, that further improvement in the Bar examination itself, through further increasing the reliability and the validity of the test, will not change the situation. The differences in the percentages failed will be eliminated only when the blacks as a group, come to the examination as well prepared as are the whites.

*Id.* at 537–39.

### Dr. Portwood's Survey

A study conducted for the plaintiffs by Dr. James Portwood, a professor at Temple University, shows that among first-time takers of the bar examinations from February 1972 to July 1976, the overall pass rate of those for whom he received data was 84.7%. The pass rate for white applicants in this group was 91.3%, while the pass rate for black applicants in the group was 47.4%. Dr. Portwood's study also analyzed the applicants for whom he received data who graduated from law schools which his study labels as "top law schools." This analysis shows that the white applicants had a pass rate of 97.4%, whereas the pass rate for the black applicants was 71.6%. Dr. Portwood's survey also pointed out that 47% of the black applicants who failed the bar examination in the period from February 1972 to July 1976 would have passed if the passing grade used in July 1972 had not been raised; whereas 74% of the white applicants who failed the bar examination during this same period would have passed if the passing grade had not been raised from its July 1972 level.

### The Validity of the Pennsylvania Bar Examination

There is and has been a significant correlation between those applicants who have failed the Pennsylvania bar examination and students who have not performed well in law school. For example, the vast majority of Temple University Law School graduates who have failed the Pennsylvania bar examination have been in the bottom of their law school classes and have generally had low cumulative grade point averages. Similarly, an analysis of the grades of students from the University of Pennsylvania Law School who took the July 1980 bar examination shows that a majority of those who failed the bar examination had received one or more unsatisfactory grades in law school.

A properly administered essay examination is a fair means of testing an applicant's competence to practice law in that it tests his ability to analyze a set of facts, to determine the legal issues involved, and to apply the applicable law. The Pennsylvania essay examination procedures are superior to those used by many other states, especially since these procedures involve law school deans and professors in the grading process.

The Court's review of the bar examination essay and MBE questions for the relevant time period shows that both the essay examination and the MBE have "content validity" in the sense that the subjects tested are those that a newly admitted attorney should reasonably be expected to know. This review further reveals that the bar examinations are neutral on their face and rationally serve the purpose for which they

have been designed, i. e., to determine minimum competence to practice law.

### The Plaintiffs' Discrimination Claim

■ The plaintiffs contend that the adjustments in the passing grade made by the Board between February 1973 and July 1976 violated the equal protection clause in that these adjustments had a disproportionate impact on Blacks and Hispanics and were made with the intent to discriminate against them. It appears that the law is now well settled that in order to establish a violation of the equal protection clause, the plaintiffs have the burden of proving that actions having a racially disproportionate impact were done with a discriminatory intent or purpose. *Personnel Administrator v. Feeny*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). As stated by the Supreme Court in *Arlington Heights, supra,*

> official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant but it is not the sole touchstone of an invidious racial discrimination." . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

*Id.* 97 S.Ct. at 563. The Court further stated that the plaintiff does not have to prove that the challenged action rested solely on racially discriminatory purposes, but rather that "a discriminatory purpose has been a motivating factor in the decision." *Id.*

Although prior to *Washington v. Davis* there was a respectable body of opinion that the proof of a disproportionate impact alone was sufficient when a violation of the equal protection clause was claimed, the Supreme Court made it clear in *Washington* and *Arlington Heights* that official action will not be held unconstitutional solely because it results in a racially disproportion-

ate impact. However, the Supreme Court has pointed out in these cases that disproportionate impact is not irrelevant, but it is no longer considered the sole basis for a finding of a constitutional violation.

■ As previously stated, Dr. Portwood's survey shows that 91% of the white applicants who took the bar examination in this time period received passing grades, whereas 47% of the black applicants received passing grades. The results of Dr. Portwood's survey show that the actions of the Board in raising the passing grade for the bar examinations between February 1973 and July 1976 had a racially disproportionate impact on black applicants. The plaintiffs contend that the Court, based upon these statistics showing a racially disproportionate impact, should infer a discriminatory intent or purpose on the part of the Board. *Washington v. Davis, supra.* It is the plaintiff's position that Dr. Bernreuter's report placed the Board on notice that any increase in the passing grade would have a disproportionate impact on the black applicants, and that the Board's actions in raising the passing grade must have been done with the intent and purpose of discriminating against the plaintiffs. Although this Court finds that the survey shows that the setting of the passing grades between February 1973 and July 1976 had a disproportionate impact on black applicants, intentional and purposeful discrimination has not been proved by the plaintiffs.

The plaintiffs rely heavily on the report of Dr. Bernreuter, which they contend placed the defendants on notice that the placement of the passing grade had a "profound effect" on the percentage of Blacks and Whites who passed the bar examination. Although Dr. Bernreuter made such a finding, he also stated that with respect to both the essay and MBE portions of the test:

> No matter where the passing point is set, except at the very bottom, more blacks than whites will be failed.

Exhibit P25, at 539. Dr. Bernreuter concluded:

The remedy for this situation is beyond the scope of the present inquiry. It seems clear, however, that further improvement in the Bar examination itself, through further increasing the reliability and the validity of the test, will not change the situation. The differences in the percentages failed will be eliminated only when the blacks as a group, come to the examination as well prepared as are the whites.

*Id.*

In *Washington v. Davis, supra,* the respondents challenged a written personnel test, known as Test 21, which was used by the District of Columbia Police Department and had the effect of excluding a disproportionately high number of black job applicants. Although the Supreme Court stated that a trial court could infer a discriminatory intent and purpose from a showing of disproportionate impact, the Court stated:

Nor on the facts of the case before us would the disproportionate impact of Test 21 warrant the conclusion that it is a purposeful device to discriminate against Negroes and hence an infringement of the constitutional rights of respondents as well as other black applicants. As we have said, the test is neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue.

96 S.Ct. at 2051. In this action, as in *Washington,* the bar examination is neutral on its face and rationally serves a purpose which the states are constitutionally empowered to pursue. *See infra* at 896–898. Accordingly, the Court cannot draw an inference of discriminatory intent and purpose on the basis of the plaintiffs' showing of a disproportionate impact.

As the Court has found, the Board established the passing grades for the bar examinations between February 1973 and July 1976 with the sole aim of determining minimum competence, and the Board never intended to exclude any minorities from admission to the bar by raising the passing grade during this period. Discriminatory intent or purpose was not a motivating factor in the defendants' decisions regarding the passing grades for the bar examinations administered between February 1973 and July 1976. *Arlington Heights, supra; Feeny, supra; Washington, supra.* Accordingly, the Court concludes that the plaintiffs have failed to carry their burden of proof with respect to this aspect of their equal protection claim.

*The Plaintiffs' Rational Relatedness Claim*

■ The second prong of the plaintiffs' constitutional attack on the bar examination is that it is not rationally related to the Board's goal of determining which applicants are minimally competent to practice law in Pennsylvania. Determining minimum competence is a legitimate state goal, and the bar examinations given during the period covered by this litigation do not violate the equal protection clause if they bear a rational relationship to this goal. *Washington v. Davis, supra; Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Tyler v. Vickery,* 517 F.2d 1089 (5th Cir. 1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976); *Chaney v. State Bar of California,* 386 F.2d 962 (9th Cir. 1967), *cert. denied,* 390 U.S. 1011, 88 S.Ct. 1262, 20 L.Ed.2d 162 (1968); *Pettit v. Gingerich,* 427 F.Supp. 282 (D.Md.1977); *aff'd,* 582 F.2d 869 (4th Cir. 1978) (per curiam).

The plaintiffs contend that both the MBE and the essay portions of the bar examination are not rationally related to the determination of minimal competence. With respect to the essay test, Professor Bender testified that in his opinion the constitutional law essay questions used in 1972 were not fit for use by law schools and that the model answers to the two constitutional law questions were not correct. Dr. Barrett, one of the plaintiffs' experts, testified that the essay test was more unreliable than the MBE, that it was not comprehensive with respect to the subjects tested because of the limited number of issues contained in the questions, and that the grading of the questions by the Board's examiners could be inconsistent. Dr. Barrett testified, how-

ever, that he had not read any of the essay questions which had been used on the bar examinations. In connection with the MBE, Dr. Barrett stated that a multiple choice test on legal subjects is of questionable validity because, unlike a mathematics multiple choice test, very few of the wrong answers are patently wrong and many of them are arguably correct. Dr. Barrett also testified that the MBE does not simulate the practice of law because a client does not present an attorney with four possible answers to his problem, but rather relies on the attorney to formulate an answer to the problem. Dr. Barrett further stated that different population groups could show different results on the MBE. He concluded that the bar examination could not measure minimal competence to practice law unless some determination was made as to what constitutes incompetent performance by an attorney.

As previously stated, there are eight essay questions and eight bar examiners. Each examiner prepares a question and a suggested answer. These questions are designed to test the applicant's ability to analyze a factual situation, determine which facts are relevant, recognize the legal issues presented and reach a legal conclusion. Prior to the examination, each question and its answer is reviewed by the other examiners, the supervising examiners and the Board. Within three weeks after the examination each examiner reads approximately 100 randomly selected answers to the question prepared by him. The numerical values assigned to some or all of the issues presented in the question are often adjusted in accordance with the answers read by the examiner. Shortly thereafter the members of the Board and the examiners hold a meeting with representatives of each of the six law schools in Pennsylvania in order to receive their comments concerning the model answers to the essay questions. After this meeting the Board incorporates the suggestions which it considers valid and a final model answer is prepared. Each examiner uses the model answer in grading the essay question which was initially prepared by him.

On the basis of the evidence, the Court finds that the essay questions used on Pennsylvania bar examinations are rationally related to measuring an applicant's competence to practice law. The use of essay questions on bar examinations has been upheld by other courts on the grounds that essay questions test an applicant's ability to analyze the facts, determine their legal significance and express an analysis and legal conclusion. *Tyler, supra; Chaney, supra; see Pettit, supra.* The Court finds that the essay questions used on the Pennsylvania bar examinations during the period in question possess all of these characteristics. As the Ninth Circuit stated in *Chaney*, a state has the right to

allow its Committee of Bar Examiners to use [an essay] examination in demonstration by those seeking admission to its bar, as a qualification standard, that they have the capacity to analyze general legal situations and to make application thereto of such general legal knowledge as can be expected to be possessed by the graduates of accredited law schools. The existence of this qualification certainly has a rational connection with the capacity to practice law, for it inherently is the primary basis of general legal service. And of course there also is involved in such an essay examination an indication as to the possession or lack of knowledge in the legal fields to which the questions relate.

*Id.* at 964.

Furthermore, the allegation that the essay questions are not rationally related to determining minimum competence because they are graded on a subjective basis is not well founded. *Tyler, supra.* Each examiner grades only the question which he prepared, and his sample answer and grading basis are reviewed not only by the supervising examiners and the Board, but are also subjected to the professional scrutiny of law school professors. Courts have upheld the use of essay questions on bar examinations where the graders did not have model answers and were using different methods of grading essays. *Richardson v. McFadden*, 540 F.2d 744 (4th Cir. 1976); *Tyler, supra.*

Mr. Earl Medlinsky, the director of testing at the Educational Testing Service in Princeton, New Jersey and one of the persons who helped to develop the MBE, stated that the MBE tests an applicant's ability to understand a set of facts, disregard irrelevant facts and apply a rule of law to the issue raised by the question. The MBE is not a memory test and every question presents a factual situation requiring analysis by the applicant. The questions are designed primarily to test the applicant's ability to apply basic principles of law and do not call for mastery of esoteric legal rules. For each subject tested on the MBE (contracts, torts, real property, criminal law, constitutional law and evidence) there is a committee of law school professors and bar admission officials who draft and carefully review the questions covering their particular field of expertise. The questions are then sent to other bar admission officials and attorneys knowledgeable in the subject area for their review and comments. The Court finds, as did Judge Blair in *Pettit, supra,* that the MBE is rationally related to measuring an applicant's minimum competence to practice law. The MBE tests "a broad spectrum of basic legal principles" requiring legal analysis of factual situations. *Id.* at 294. We therefore conclude that the plaintiffs have failed to carry their burden with respect to this aspect of their equal protection claim. *Washington, supra.*

### Conclusion

Although the plaintiffs have failed to carry their burden of proving their allegations that the Board intended to discriminate against them and that the bar examination is not rationally related to determining minimum competence to practice law, a review of the Hastie Committee Report, the Liacouras Committee Report, Dr. Bernreuter's report and Dr. Portwood's survey have convinced this Court that the Blacks, for reasons which have not been presented in this litigation, are failing the Pennsylvania bar examination in disproportionate numbers. Although affirmative action policies in admitting minorities to law schools are now affording more minorities the opportunity to take the Pennsylvania bar examination, the record of their disproportionate failures cries out for an in-depth study to ascertain the reason.[4] Moreover, since the majority of the black applicants appear to cluster at a lower grade level than the white applicants, attempting to eliminate the disproportionate impact by lowering the passing grade would mean that the passing grade would have to be lowered to a point where practically all of the applicants would pass the bar examination. Lowering the passing grade to such an extent could defeat the purpose of the bar examination and lend credence to those who have contended for years that a bar examination is unnecessary. These are policy questions, however, which are not at issue in this litigation.

For the reasons set forth in this Memorandum, the Court will enter a verdict and judgment in favor of the defendants and against the plaintiffs. This Memorandum is in lieu of findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). An appropriate order will accordingly be entered.

4. It would appear that such a study should include a comparative analysis of the answers of those applicants who failed to pass with the answers of those who received a passing grade. It was testified at trial that the applicants' answers were not available to the plaintiffs for the period covered in this litigation because it was the practice of the Board to destroy the applicants' answers after a period of time.

| | SAT | PASSED | PERCENTAGE |
|---|---|---|---|
| February 1972 bar examination | 211 | 208 | 98.58% |
|    85 Multistate-passed | | | |
| July 1972 bar examination | 1141 | 1113 | 97.55% |
|    130 Multistate passed | | | |
|    100 Multistate—50 Essay | | | |
|    85 Multistate—65 Essay | | | |
| February 1973 bar examination | 268 | 224 | 83.58% |
|    130 Multistate passed | | | |
|    105 Multistate—50 Essay | | | |
|    85 Multistate—65 Essay | | | |
| July 1973 bar examination | 1490 | 1419 | 95.23% |
|    125 Multistate passed | | | |
|    70 Essay passed | | | |
|    102 Multistate—50 Essay | | | |
|    85 Multistate—65 Essay | | | |
| February 1974 bar examination | 365 | 314 | 86.03% |
|    130 Multistate passed | | | |
|    70 Essay passed | | | |
|    105 Multistate—50 Essay | | | |
|    85 Multistate—65 Essay | | | |
| July 1974 bar examination | 1746 | 1639 | 93.87% |
|    135 Multistate passed | | | |
|    Multistate-Essay combined 55 | | | |
| February 1975 bar examination | 370 | 244 | 65.95% |
|    Multistate-Essay combined 60 | | | |
| July 1975 bar examination | 1649 | 1389 | 84.23% |
|    135 Multistate passed | | | |
|    Multistate-Essay combined 60 | | | |
| February 1976 bar examination | 555 | 370 | 66.67% |
|    Multistate-Essay combined 60 | | | |
| July 1976 bar examination | 1705 | 1528 | 89.62% |
|    135 Multistate passed | | | |
|    Multistate-Essay combined 60 | | | |

## MEMORANDUM

### On Motion For Reconsideration

#### Introduction

Plaintiffs in this action, three Blacks and two Hispanics who each failed the Pennsylvania bar examination at least once between February 1973 and July 1976, ask this Court to reconsider its findings of fact and conclusions of law filed on August 10. Plaintiffs' reconsideration motion was filed on August 27, 1981.

On September 14, 1981, plaintiffs filed a notice of appeal. Generally, "filing a notice of appeal immediately transfers jurisdiction of a case from the District Court to the Court of Appeals," *United States v. Lafko*, 520 F.2d 622, 627 (3d Cir. 1975); *Plant Economy, Inc. v. Mirror Insulation Co.*, 308 F.2d 275, 276–77 (3d Cir. 1962). A 1979 amendment to Rule 4 of the Federal Rules of Appellate Procedure, now embodied in Rule 4(a)(4), provides that a notice of appeal filed before the disposition of a pending posttrial motion "under Rule 59 to alter or amend the judgment" or "under Rule 59 for a new trial ... shall have no effect."

Plaintiffs have not termed their Motion a Rule 59 pleading but

Any motion that draws into question the correctness of the judgment is functionally a motion under Civil Rule 59(e), whatever its label. Thus a motion to "reconsider" . . . or "reargue" is a motion under Rule 59(e) (to alter or amend a judgment) and under Rule 4(a)(4) will postpone the time for appeal if the motion was timely filed.

9 *Moore's Federal Practice* § 204.12(1) (page 4–67). (2d Ed. 1974), citing *Richerson v. Jones*, 572 F.2d 89 (3d Cir. 1978). The Court has therefore reconsidered its findings of fact and conclusions of law as set forth in its Memorandum of August 10, 1981.

### Plaintiffs' Grounds for Reconsideration

Plaintiffs maintain that the Court, "in its 'Conclusion' . . . [page 898 of its August 10 Memorandum]" does not address the third prong of plaintiffs' argument, to wit, that the changes in the passing grades, and the decision to change the passing grades between 1973 and 1977, were arbitrary and violated the Due Process and Equal Protection clauses of the Fourteenth Amendment.

Though the Court did not, in its concluding paragraph [page 898 of the August 10 Memorandum] specifically refer to this argument, a reading of the entire memorandum shows that this point was not overlooked. Page one of the Court's memorandum clearly notes plaintiffs' contention that "changes in the passing grades were done arbitrarily . . ." (Memorandum at 886).

Recognizing this argument of plaintiffs, the Court examined the actions of defendants to determine whether the bar examination was rationally related to assessing competence to practice law; whether the Board acted with discriminatory intent in adjusting the passing scores; and whether the Board acted arbitrarily in adjusting the scores required to pass the examination. The Court found as a fact that the bar examination was a valid test, that the Board lacked discriminatory intent, and that the score changes were not arbitrary.

Evidence presented at trial showed that before 1972 the Board set a passing score of 70 for the then all-essay bar examination. The Board felt that a passing grade of 70 adequately measured minimum competence to practice law. (Memorandum at 890). In 1972 the Board initiated the Multistate Bar Examination (MBE) as part of an effort to eliminate the possibility of bias against minorities resulting from the pre-1972 essay format of the test. (Memorandum at 892–893).

The Board did not know what MBE score would measure minimum competence or how examinee performance on the MBE would compare to the essay portion of the exam. To avoid failing qualified applicants and willing to admit some unqualified applicants, the Board intentionally set a low minimum passing score for the February 1972 exam, intending to raise the score should a review indicate the February minimum was too low. (Memorandum at 890). A record high 99 percent of examinees passed the February 1972 examination. (Memorandum at Appendix A). In the 17-year period prior to the initiation of the MBE in 1972, the average pass rate ranged from 68 percent to about 80 percent. (Memorandum at 891–893). The Board thus began to adjust the initial February 1972 minimum passing score because it felt the February minimum (85 on the MBE) was not an adequate measure of minimum competence to practice law. (Memorandum at 891):

As this Court stated in its memorandum of August 10, 1981:

During these years in which the MBE was included as part of the Pennsylvania bar examination and the Board was experimenting with the passing grade, various members of the Board became increasingly concerned that some applicants were passing the examination with scores of 50 or lower on the essay part of the examination. These scores, in the Board's view, did not demonstrate sufficient competence to practice law. (Memorandum at 891–892).

Thus the Board, for a rational and non-arbitrary reason, developed a minimum passing score combining the MBE and essay por-

tions of the examination. (Memorandum at 892).

The Court found as fact that the bar examination itself has content validity and is neutral on its face. (Memorandum at 895). On this basis, the Court found that raising the passing grades after the February 1972 examination was rationally related to the Board's goal of determining minimum competence to practice law. (Memorandum at 895). The Court also found no discriminatory intent or motive in the Board's actions. (Memorandum at 896). Under these circumstances, the Board's adjustment of minimum passing scores cannot be characterized as arbitrary.

In their motion for reconsideration and reargument, plaintiffs also raise questions about the legal standard of review employed by the Court. (Plaintiff's memorandum at 893–894). The Court, upon reconsideration of its findings of fact and conclusions of law, determines that its factual findings are substantiated by the evidence in the record and that the proper legal standards were applied to those findings. This memorandum shall be considered as supplementing the Court's findings of fact and conclusions of law set fourth in its memorandum of August 10, 1981.

The Court, having considered the plaintiffs' motion for reconsideration and reargument and having determined that the plaintiffs have presented no reason for the Court to change its findings of fact and conclusions of law filed herein on August 10, 1981, will accordingly enter an order stating that its order of August 10, 1981 remains in full force and effect.